IN THE MATTER OF JOHN R. LENNAN, AN
ATTORNEY-AT-LAW.

Argued March 4, 1986—Decided May 22, 1986.

*David E. Johnson, Jr.,* Director, argued the cause on behalf of the Office of Attorney Ethics.

*Louis Pashman* argued the cause on behalf of the respondent (*Cummins, Dunn & Pashman,* attorneys; *Louis Pashman* and *Steven A.* Beckelmann, on the briefs).

PER CURIAM.

This disciplinary proceeding results from a random compliance audit of the trust funds of respondent, John R. Lennan, by the Office of Attorney Ethics (OAE) pursuant to Rule 1:21–6(c). Upon receipt of the auditor's report, the OAE filed a Petition for Emergent Relief, which we granted on September 21, 1984, temporarily suspending respondent from the practice of law. Thereafter, the OAE filed a complaint charging that respondent misappropriated his clients' funds in violation of *DR* 9–102 and *DR* 1–102(A)(3), (4) and (6). Respondent filed an answer admitting the factual allegations of the complaint and setting forth mitigating circumstances.

After a hearing, the Bergen County District Ethics Committee (DEC) recommended that respondent's suspension from the practice of law be continued until such time as he shall petition for reinstatement and prove to the Court's satisfaction that he can be relied upon properly to manage his trust account.

Upon its review of the full record, the Disciplinary Review Board (DRB) found that the DEC's finding of unethical conduct was fully supported by clear and convincing evidence. The DRB concluded that respondent had knowingly misappropriated his clients' funds for his personal use in violation of *DR* 9–102

and *DR* 1–102(A)(3), (4) and (6).[1]  A majority of the DRB members recommended that respondent be disbarred.  Our independent appraisal of the records leads us to accept the majority's recommendation.

I

The DRB in its Decision and Recommendation (Decision) stated that the audit revealed the following:

1. BYRON AND MARGUERITE MARSH

A deposit of $16,700 was credited to this account on April 28, 1984.  This amount was to be held by Respondent until the closing date for the sale of real estate which was scheduled for August 15, 1984.  Respondent issued a check to his order for $5,000 on April 30, 1984.  Respondent issued another check to his order for $5,000 on May 9, 1984.  This latter check was posted to the ledger card of another client, Carl W.L. Reiks.

2. CARL W.L. REIKS

A deposit of $6,900 was credited to this account on July 5, 1984 as a partial real estate deposit.  Respondent's check to himself for $5,000 of May 9, 1984 was charged against this account.  This check was issued almost two months before the receipt of Reiks' deposit.  The only funds in the trust account at the time this check was paid were funds for the Marsh closing.  The $5,000 were replaced by a deposit by Respondent on September 4, 1984.

3. RONALD AND CHARLOTTE BOOTH

A real estate deposit of $9,900 was credited to this account on November 24, 1982.  Respondent took $2,000 from that deposit by issuing three checks to his order:  December 23, 1982, $1,000; January 13, 1983, $500; and February 3, 1983, $500.  These funds were replaced on March 21, 1983 when Respondent deposited $1,550 into the trust account.  This amount represented the $2,000 taken by Respondent less his fee of $450 on the Booth closing.

4. EDWARD AND ELLEN HEDLUND

The sum of $10,400 was credited to this account on June 24, 1983 as a deposit for real estate.  Respondent issued two $500 checks to his order, one on June 24, and the other July 22.  The checks were taken from the Hedlund deposit being held for the closing which took place on August 1, 1983.

---

[1]We refer to the Disciplinary Rules that governed the conduct of attorneys at the time of these occurrences.  American Bar Association, *Code of Professional Responsibility* (1969).  Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by the Court, govern that conduct.  *R.* 1:14.  These new Rules contain provisions equivalent to the Disciplinary Rules involved here.

The following auditor's schedule sets forth the number of days that respondent used his clients' funds:

| CLIENT | AMOUNT TAKEN | DATE OF CHECK | DATE FUNDS RETURNED | # OF DAYS FUNDS USED |
|--------|--------------|---------------|---------------------|----------------------|
| Marsh | $ 5,000 | 4/30/84 | 8/6/84 | 98 |
| Rieks | 5,000 | 5/9/84 | 9/4/84 | 118 |
| Hedlund | 500 | 6/24/83 | 8/1/83 | 37 |
| " | 500 | 7/22/83 | 8/1/83 | 9 |
| Booth | 1,000 | 12/23/82 | 3/20/83 | 87 |
| " | 500 | 1/13/83 | 3/20/83 | 66 |
| " | 500 | 2/3/83 | 3/20/83 | 45 |
| | $13,000 | | | |

By examining respondent's trust account, the auditor concluded that there was a pattern of taking trust funds held as deposits on real estate closings and replacing them before the closing occurred. From December 25, 1982, through September 4, 1984, respondent misappropriated a total of $13,000 of clients' funds. From May 1, 1984, to August 6, 1984, his trust account was short $9,843.35. He reduced that shortage to $4,843.35 on August 6, by depositing $5,000, and on September 4, 1984, he eliminated it entirely by depositing another $5,000.

## II

The facts in this case are not in dispute. Respondent admits that he misappropriated a total of $13,000 in funds from four clients. He admitted this misappropriation to the auditor, to the OAE, and before the DEC and DRB.

Respondent, a sole practitioner, has practiced law as his only profession since 1959. A long-time resident of Tenafly, New Jersey, he was in private practice there from 1963 to 1970 and from 1972 to 1984. His income has always been modest. In 1983, his gross income was $25,000; in 1984, at the time of his suspension, it was $15,000. Respondent was the sole support of

his wife and the primary support of his two daughters. At the time of these incidents, his two daughters were in private colleges, and the combined cost of the tuitions was $18,000 a year. In the spring of 1983, his wife was diagnosed as having diabetes, which led to substantial medical expenses. Other major expenses included a monthly mortgage payment of $548 for respondent's home that was valued at $130,000. At the DEC hearing, respondent stated that there was a small first mortgage on his home of approximately $6,000. Respondent did not attempt to secure a second mortgage on the house, but he did borrow up to $10,000.00 from banks during this period. He was forced to discontinue this alternative, however, because he could no longer afford the high interest rates. Respondent's wife and daughter had a joint savings account that contained about $9,000. Respondent did not ask to borrow these funds because he did not want to upset his family.

Although candidly admitting his misappropriations, respondent urges that *In re Wilson*, 81 *N.J.* 451 (1979), the controlling case on knowing misappropriations, does not mandate disbarment for all misappropriations or preclude consideration of any mitigating circumstances. Respondent seeks support for his position from the following statement in *In re Wilson*, 81 *N.J.* at 461:

> In summary: maintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that *mitigating factors will rarely override* the requirement of disbarment. [Emphasis added.]

Respondent claims that the major factor mitigating against his disbarment is that he misappropriated the funds as a result of the extreme financial pressure of providing for his family, specifically, the college education of his two daughters. In his brief, respondent cites the following as additional mitigating factors that make his case unique and thus not subject to *Wilson*'s disbarment rule:

> There has not been a single complaint by a client. No client has suffered a loss or even a delay in receipt of funds due. Three of the clients have submitted affidavits indicating that they would have authorized each action taken by Mr.

Lennan had they known of his economic difficulties. All three clients also stated that they were fully satisfied with respondent's representation of them. Mr. Lennan made no attempt to disguise or mischaracterize any transaction and fully disclosed his actions to the Office of Attorney Ethics. Mr. Lennan has expressed severe regret for his actions.  * * *

In addition, Mr. Lennan has never had any other ethical charges brought against him. None of his actions involves any fraudulent statements or intentional misrepresentations to clients. Mr. Lennan has a distinguished background in civic and religious service and a fine reputation in his community.

## III

Based on our independent review of the record, we conclude that because respondent knowingly misappropriated funds from his clients, *In re Wilson* mandates his disbarment.

*In re Wilson*, 81 *N.J.* at 455 n. 1, defines misappropriation as any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.

We realize the harshness and inflexibility of the *Wilson* rule.[2] Recently, in *In re Noonan*, 102 *N.J.* 157 (1986), we again considered the *Wilson* rule and affirmed our commitment to it. Specifically, we addressed the factors that will evoke the application of the rule. In *Noonan*, 102 *N.J.* at 158, we stated:

The misappropriation that will trigger automatic disbarment under *In re Wilson*, 81 *N.J.* 451 (1979), disbarment that is "almost invariable," *id.* at 453, consists *simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking.* It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, are irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.... The presence of "good character and fitness," the absence of "dishonesty, venality, or

---

[2]In *In re Smock*, 86 *N.J.* 426 (1981), we decided that because of the severity and inflexibility of the *Wilson* rule, it should not be applied retroactively.

immorality"—all are irrelevant. While this Court indicated that disbarment for misappropriations shall be "almost invariable," the fact is that since *Wilson,* it has been invariable. [Emphasis added; footnote omitted.]

Most of respondent's mitigating factors have previously been considered in other misappropriation cases. In *In re Gavel,* 22 *N.J.* 248, 265 (1956), we held that the fact that no client suffered a loss was fortuitous and therefore irrelevant. In *Wilson,* we explicitly noted that the fact that an attorney returned the funds to his clients is unpersuasive, as is evidence of his good character. 81 *N.J.* at 459, 460.

More importantly, in *Wilson* we addressed the respondent's main point that he used his client's money only as a result of extreme financial pressure. There we said:

An attorney beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact, he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary. [*Id.* at 460 (footnote omitted).]

*See also In re Marks,* 96 *N.J.* 30, 36 (1984) (severe financial pressure rejected as a mitigating factor).

Moreover, we find respondent's reliance on *In re Arthur D. Reiss,* 101 *N.J.* 475 (1986), and *In re Stein,* 97 *N.J.* 550 (1984), to be misplaced. In each case, the attorney withheld his client's funds in order to pay his own fee. While both attorneys were charged with violating Rule 9–102, neither attorney was charged with misappropriation. Similarly, we find no merit in respondent's allegation that his actions were authorized by the clients. True, respondent secured affidavits from three of his clients stating that if they had known of his financial plight, they would have lent him the money that he appropriated. Nevertheless, at the time of the misappropriations no client knew of respondent's situation or consented to his use of his or her funds.

## IV

While we sympathize with respondent's desire to provide for his family, respondent had funds available. There was only a $6,000 mortgage on his $130,000 house, and his wife and daughter had a joint savings account worth approximately $9,000. Respondent could have mortgaged his home or asked his family for the money, but chose not to because of personal pride. Instead, he misappropriated the funds of four clients.

Accordingly, we hold that the respondent knowingly misappropriated funds in violation of *DR* 9–102 and must be disbarred. *Wilson*'s vitality continues and this proceeding is governed by that decision.

We further direct respondent to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that JOHN R. LENNAN of TENAFLY, who was admitted to the bar of this State in 1960, be disbarred from the practice of law, and it is further

ORDERED that JOHN R. LENNAN reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that JOHN R. LENNAN be permanently restrained and enjoined from practicing law; and it is further

ORDERED that JOHN R. LENNAN comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.