IN THE MATTER OF HARRY N. DEVLIN, AN
ATTORNEY AT LAW.

Argued September 28, 1987—Decided January 15, 1988.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*J. Michael Nolan* argued the cause for respondent (*Pitney, Hardin, Kipp & Szuch* and *Joseph M. Nolan and Associates,* attorneys; *J. Michael Nolan, Joseph M. Nolan* and *Patricia B. Santelle,* on the brief).

PER CURIAM.

This is an attorney-disciplinary case in which the Disciplinary Review Board (DRB or Board) determined that respondent, Harry N. Devlin, committed several ethics violations, including the knowing misappropriation of client's funds. The Board recommended that respondent should be disbarred.

The ethics charges were heard initially by the District XII (Union County) Ethics Committee (Committee). It determined that respondent had committed ethics violations, following which determination the matter was presented to the Board. There respondent acknowledged that he had made an improper

withdrawal of escrow moneys but requested a remand to establish a meritorious defense and to develop mitigating evidence relating to alcoholism. The Board remanded the matter to the committee for such a supplemental hearing. Following the completion of the remand, the DRB heard the matter in light of the additional evidence. It concluded that respondent should be disbarred.

We have independently reviewed the record and are satisfied that clear and convincing evidence support the charges and the findings of fact made by the tribunals below, including particularly the misuse and misappropriation of clients' funds. Discipline in the form of disbarment, as recommended by the DRB, is appropriate under these circumstances.

## I.

The facts as developed before the district ethics committee were fully and accurately summarized by the Board. These facts relate in detail the circumstances surrounding the ethics violations.

It appears that in June 1982, respondent represented Mr. Conklin in a real estate closing. Conklin was then involved in divorce proceedings in which he was represented by another attorney. Respondent was required to hold proceeds from the real estate closing in an interest bearing account. According to the DRB these events occurred:

On July 2, 1982, respondent deposited $20,000 in the Merrill Lynch Government Fund, Inc., account # 232216–3. The signature card respondent completed when he opened the account had several peculiarities. The account was for "Harry Devlin". The social security number on the account was respondent's. Respondent's wife's name was indicated. Reference was made to an account with the National Bank of New Jersey (neither respondent's trust nor business account was with this bank). Respondent checked "none" where the card requested "power of attorney". The lines for "name of agent" and "relationship to client" were left blank. Finally, the objective of the account was investment. There was absolutely no mention of the clients.

On July 7, 1982, Mrs. Conklin's attorney wrote to respondent confirming that respondent was to deposit $20,000 in an "interest bearing escrow account, preferably the Merrill Lynch Money Market Fund, until the final resolution as

to the adjustments ... is resolved by the parties or the court." On July 8, 1982, respondent informed Mrs. Conklin's attorney that the $20,000 had been deposited into the Merrill Lynch Government Fund, Inc. The next day respondent advised him of the account number.

On February 8, 1983, respondent withdrew $13,000 from the Merrill Lynch account. On February 11, 1983, a $13,000 deposit was made into respondent's trust account. He never notified the Conklins or their attorneys of this withdrawal or deposit.

Following this withdrawal of the escrow moneys, the DRB determined that respondent engaged in the following course of conduct, *viz:*

In November the Conklins settled their differences in the divorce matter and agreed to the adjustments. On November 11, 1983, the attorney representing Mr. Conklin in his divorce action telephoned respondent and asked respondent to forward the escrow money. This request was confirmed by letter dated November 14, 1983. The next day respondent's secretary wrote to Mr. Conklin's attorney, explaining that respondent was attending the bar convention and would not return until November 21. On December 6, when Mr. Conklin's attorney still did not hear from respondent, he attempted to reach him. Still unsuccessful, Mr. Conklin's attorney attempted to contact respondent three more times: December 21, 1983, and January 4 and 19, 1984. Finally, on January 20, 1984, respondent telephoned Mr. Conklin's attorney and spoke simultaneously with the two attorneys representing the Conklins in their divorce. Respondent informed them he would immediately forward a check in the proper amount along with an explanation concerning the computation of interest.

Prior to telephoning the Conklins' attorneys, respondent appeared to take the steps necessary to be able to forward the escrowed money. On January 6, 1984, the Merrill Lynch account was closed. The shares were redeemed by wire for $8,754.48. A separate check for income dividends in the amount of $12.67 was made payable to respondent.

Respondent's trust account statement for January 1984 revealed an opening balance of $96,697.92. By January 11, that amount had dissipated to $281.79. On January 13, a deposit of $8,754.48 was made. Although several other deposits were also made during the remainder of that month, none was in the amount of $12.67.

On January 25, 1984, respondent issued a check for $22,817.84 drawn on his trust account. Respondent claimed this amount reflected the original $20,000 plus the interest the money would have earned had it been held in an interest bearing account from July 1982, which it clearly was not. When respondent issued that check, his trust account reflected a balance of $215,505.38. However, by the time the check was processed on February 1, the balance in respondent's account had been depleted to $7,775.63; hence, the check was dishonored and returned for insufficient funds.

When the Conklins' attorneys were informed on February 7, 1984, that the check had been dishonored, they again contacted respondent. Respondent immediately had a treasurer's check prepared and forwarded. He again promised counsel an explanation concerning the calculation of interest and additionally promised to document the banking arrangements in Boston that had allegedly caused the check to be dishonored. The treasurer's check was ultimately honored.

The Conklins' attorneys informed the Office of Attorney Ethics (OAE) of the dishonored check. The OAE requested respondent furnish records and an explanation concerning the dishonored check and the maintenance of his escrow and trust accounts. Respondent through his counsel then consented to a temporary suspension from the practice of law, which was ordered by this Court. The matter was transferred by OAE to the local district ethics committee. No response to the records request was ever received by either OAE or the district committee. Moreover, respondent never filed an answer to the formal ethics complaint and, after receiving notice of the hearing, respondent never contacted the committee or requested an adjournment.

Following its initial hearing the Committee determined:

(1) respondent's failure to indicate that the Merrill Lynch account was a fiduciary account violated DR 9–102(A); (2) respondent's failure to pay promptly the escrow fund to Mr. Conklin's attorney violated DR 9–102(B)(4); (3) respondent's withdrawal of $13,000 from the Merrill Lynch account without notifying the Conklins was unauthorized and in violation of DR 9–102 and DR 1–102(A)(3), (4) and (6); (4) respondent's issuance of a trust account check that was subsequently returned for insufficient funds violated DR 1–102(A)(6) and DR 6–101(A)(1); (5) respondent's failure to maintain adequate records violated R. 1:21–6 and DR 9–102(B)(3) and (C), and (6) respondent's failure to cooperate with either his own independent accountant or OAE's accountant violated DR 1–102(A)(1), (4), (5) and (6). The committee recommended public discipline.

As earlier noted, the DRB remanded the matter to enable respondent to present additional evidence. On the remand respondent claimed that poor bookkeeping practices and a lack of adequate supervision of the administration of his law office caused the deficits in his trust account. Respondent's further explanation, as recapitulated by the DRB, was:

For the first time respondent detailed a purported scam in 1977, whereby one Billy Carr, a former client, stole $30,000 from respondent. Respondent issued a

trust check for $30,000, but Carr informed respondent the bank in Texas would not honor the New Jersey check. Respondent then wired $30,000 and orally placed a stop payment order on the trust account check. He failed, however, to execute the proper bank form and never signed the stop payment form. Approximately six months later, Carr cashed the original check. Respondent's bank honored the check. Moreover, because respondent had failed to sign the stop payment order, he was not able to obtain any satisfaction from the bank. He was also unsuccessful in his attempt to retrieve $30,000 from Carr. Carr is currently in jail for fraud. Respondent, thus, lost $30,000 from his trust account. He borrowed small amounts of money to cover some of the deficit, but since 1978 he never completely replenished his account.

The respondent also presented mitigation evidence relating to alcoholism. This was also recounted by the DRB, *viz:*

Respondent also discussed his alleged alcoholism with the psychiatrist. He claimed his "undisciplined behavior" due to his heavy consumption of alcohol was the cause of his failure to sign the stop payment form. He also claimed, however, that he never allowed his clients to be hurt by such "undisciplined" behavior.

The psychiatrist concluded respondent was not an alcoholic at the time of the misappropriation, although he was under the influence of alcohol during some of that time. Furthermore, respondent's state of mind at that time did not impair the moral quality of his conduct. "At all times, he was aware of his moral and legal obligations and of his behavior." He was able to distinguish right from wrong and was capable of knowing that he was engaging in illegal and unethical conduct. "He was unwilling to rectify his situation because of chronic self-destructive attitude and behavior." Respondent, exhibiting the behavior typical of heavy drinkers, avoided, denied and delayed appropriate behavior.

Respondent next met with members of the Alcohol Advisory Committee (AAC). Respondent again recounted the purported scam in 1977, in which he was swindled out of $30,000. Before the AAC, however, respondent stated that he could "very easily have replaced this lost money from his earnings which amounted to about $100,000 a year." He admitted that his drinking, his social and business pressures, his impaired judgment and his general disorientation prevented him from replenishing his trust account. He further admitted that he was aware of his continued unethical conduct, that he understood the nature of the unethical conduct, and that he was aware that what he did was ethically wrong. The AAC concluded respondent's alcohol consumption was a factor in his behavior. However, "the respondent's judgment was no so impaired as to render him incapable of recognizing that his failure to replace the $30,000 in the trust account was wrong and improper."

Based on this augmented record, the committee adhered to its original determination that respondent was guilty of unethical conduct, *see supra* at 138, recommending that respondent be publicly reprimanded. The DRB on appeal considered the

record and, as noted, determined that respondent should be disbarred.

We are thus presented with a full record in considering the gravity of respondent's conduct, particularly that relating to the handling of escrow and trust moneys. We determine the nature of appropriate discipline in light of evidence proffered by respondent concerning reasons for the conduct and his alcoholism.

## III.

The record demonstrates clearly and convincingly that respondent misused client's trust moneys. As found by the DRB, respondent in 1978 knew of the shortage in his trust account and admitted that he never replaced that amount. Respondent's unauthorized invasion of his trust account began in 1978 and continued for six years. Respondent invaded the trust funds of one client to pay another, although he apparently also contributed some personal funds periodically, thereby apparently managing to keep his trust account out of a deficit posture until February 1984, when the Conklin check bounced.

From the records that are available, we conclude that respondent failed to safeguard the Conklins' funds and knowingly misappropriated their money. Respondent admits transferring $13,000 from the Merrill Lynch account to his trust account in February 1983. From then until February 8, 1984, when the money was returned to the Conklins, a minimum of $13,000 should have remained in respondent's trust account. Due to respondent's noncooperation, the only statements available for this period of time are for January and February 1984. The January statement alone sufficiently demonstrates that respondent was out-of-trust. It discloses substantially less than $13,000 on two days. On January 10, 1984, the account showed a balance of $664.56 and on January 11, 1984, the balance was $281.79. Clearly, the Conklin trust funds had been diverted for other purposes. After the deposit on January 13 of $8,754.48,

which was obtained from the closing of the Merrill Lynch account, respondent's trust account should have reflected an amount greater than the total $21,754.48 held in trust. However, from January 31 through February 6, 1984, the trust account balance was less than $21,754.48. It was during this seven day period, on February 2, that the first Conklin check was returned for insufficient funds.

Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 *N.J.* 451, 455 n. 1 (1979).

Respondent has acknowledged that he "didn't do the proper thing by going and borrowing the money to that effect, and that's when really the problems begin, okay. All of a sudden the short fall occurred." This kind of "borrowing" of clients' funds is inexcusable, *see In re Warhaftig*, 106 *N.J.* 529, 533 (1987); *In re Lennan*, 102 *N.J.* 518, 523 (1986). Such action is expressly proscribed. *In re Brown*, 102 *N.J.* 512, 517 (1986). As this Court observed in *In re Noonan:*

> [t]he misappropriation that will trigger automatic disbarment under *In re Wilson*, ... consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment. [102 *N.J.* 157, 159–60 (1986) (citation omitted).]

That no client was actually harmed is irrelevant. *In re Warhaftig, supra,* 106 *N.J.* at 534; *In re Lennan, supra,* 102 *N.J.* at 524; *In re Gavel,* 22 *N.J.* 248, 264–65 (1956). In this case, however, although contacted by the Conklins' attorney on November 11, 1983, respondent did not provide a check that

could be honored until February 8, 1984, a period of three months. Moreover, respondent has never rendered an accounting to show the calculation of interest for the entire escrowed amount. Indeed, respondent argues that his sole vice is inadequate records. However, poor accounting procedures are no excuse for using clients' funds and poor recordkeeping cannot be used to camouflage attorney theft or misuse. *See In re Fleischer,* 102 *N.J.* 440, 447 (1986).

The Board also determined that respondent committed ethics infractions in failing to maintain proper records. Respondent claims the evidence presented cannot clearly and convincingly establish more than so-called "sloppy recordkeeping." We disagree. Respondent violated the standards in failing to establish and maintain proper escrow accounts as well as his failing to maintain proper records in violation of Rule 1:21–6 and Disciplinary Rule 9–102.

Respondent's reliance on a general alcoholism defense is unavailing in these circumstances. Alcoholism is not a mitigating factor sufficient to overcome the presumption of disbarment in a misappropriation case. *In re Gilliam,* 106 *N.J.* 537, 537–38 (1987); *In re Canfield,* 104 *N.J.* 314, 315 (1986); *In re Monaghan,* 104 *N.J.* 312, 313 (1986); *In re Hein,* 104 *N.J.* 297, 303 (1986). In any event, respondent was not so impaired that he did not know what he was doing. Indeed, respondent admits "I knew I transferred" the money; "I did transfer the money in with the obvious intent that hey, I was under the influence. I don't want to sit here and tell you why I don't remember that I got so drunk that time, and I went out and took the money." Although alcoholic dependency clearly contributed to the loss of respondent's critical control of judgment, his dependency cannot forestall disbarment for taking clients' money. *In re Hein, supra,* 104 *N.J.* at 304.

Based upon respondent's knowing misappropriation of client's funds, disbarment is called for. Respondent shall reim-

burse the Ethics Financial Committee for administrative costs, including the preparation of transcripts.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that HARRY N. DEVLIN of WESTFIELD, who was admitted to the bar of this State in 1973, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that HARRY N. DEVLIN be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs including the preparation of transcripts.