IN THE MATTER OF CHARLES W. SOMMERS, AN
ATTORNEY AT LAW.

Argued September 27, 1988—Decided February 17, 1989.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Charles W. Sommers* argued the cause *pro se.*

PER CURIAM.

This disciplinary proceeding arises out of three presentments filed by the District II–B (Bergen County South) Ethics Committee (the DEC Committee), which concluded in each matter that respondent had committed unethical conduct. The Disciplinary Review Board (DRB) agreed with the DEC's finding of unethical conduct, and unanimously recommended that respondent be disbarred. We remanded the matter to the DEC for a further hearing on respondent's claim of right to the funds that the DRB determined he had misappropriated. After a hearing the DEC concluded "based upon the facts adduced and testimony adduced before it that the respondent did in fact willfully and knowingly misappropriate funds in his trust account that belonged to other than himself, namely to Mary Gener and to John Gener." Our independent review of the record leads us to the conclusion that respondent misappropriated funds. We conclude that he should be disbarred.

I

Respondent was admitted to the bar in 1969. The presentments stem from seven complaints. Six of these complaints were filed by former clients of the respondent. The seventh complaint was filed by the Office of Attorney Ethics (OAE). We discuss first the six complaints filed by respondent's former clients, all of which establish a pattern of gross neglect and negligence on the part of respondent.

*Gullone Matter*

In May 1978 respondent was retained by James Gullone to institute a legal action for personal injuries sustained in an

automobile accident. Although respondent filed suit for Mr. Gullone, the suit was dismissed for failure to answer interrogatories. Throughout his representation of Mr. Gullone, respondent failed and refused to advise the client adequately of the progress of his legal action, failed and refused to communicate in writing or by telephone with his client, and failed and refused to turn over papers or provide information to the client when the client sought to engage other counsel.

*Jazwinski Matter*

In May 1983 respondent was retained by Mary and John Jazwinski to represent them in the purchase of a condominium. The closing for the condominium occurred on May 11, 1983. Respondent failed to give his clients the deed to the condominium until September 1983. Additionally, after the closing respondent failed and refused to provide his clients with a copy of their closing statement, any explanation of the matters shown on the closing statement, and failed and refused to answer any phone calls concerning the closing statement.

*Berkey Matter*

In August 1980 respondent was retained by Mr. Berkey to represent him in a divorce action. Due to the neglect of respondent, Mr. Berkey was precluded from testifying on his own behalf at the trial. Respondent filed an appeal from the trial court decision without requesting that any fee be paid for his services. Subsequently the divorce action was satisfactorily settled but respondent failed and refused to provide his client with an accounting of the sum of $400 allegedly paid to respondent for expenses, failed to provide his client with a copy of the Final Judgment of Divorce or deed to the marital home, and refused to answer any of his client's telephone calls or letters.

*Dispoto Matter*

In December 1979 respondent was retained by Madeline Dispoto and her husband to institute a legal action for personal

injuries Mrs. Dispoto had sustained in an automobile accident. Although respondent filed suit for the Dispotos, the suit was dismissed for lack of prosecution on August 9, 1982, with leave to reopen the case. No further action being taken, the action was dismissed with prejudice on March 8, 1983. Earlier in his representation, respondent advised the Dispotos that the suit was proceeding and that he would be "wrapping it up soon." Subsequently, respondent failed to respond to any of his clients' inquiries on the progress of their legal action, failed and refused to communicate in writing or by telephone with his clients, and failed and refused to turn over papers or provide information to the client who sought to engage other counsel.

### Conway Matter

Anna Conway died on January 5, 1977. She left a will wherein she named respondent's father as the executor. Prior to her death Ms. Conway had been confined to a hospital, and a law firm had been retained to start incompetency proceedings against her. However, prior to any judgment of incompetency, Ms. Conway died.

Respondent was hired by his father, the executor, as the estate's attorney. He filed for the necessary probate in May 1978. Two of the beneficiaries of the estate, one of whom was named as alternate executor under Ms. Conway's will, constantly wrote letters of inquiry and made telephone calls to the respondent, concerning an accounting and the distribution of the estate. All such inquiries were unanswered. No writings or documents were submitted for the estate; no accounting ever was prepared or filed; and at the time the presentment was filed, the status and location of the estate's assets were not known.

### Guido Matter

In 1977, Louis R. Guido retained respondent to represent him in a divorce action. Judgment for divorce was entered on

February 2, 1978, and incorporated the disposition of the marital property. The marital premises were sold pursuant to the Judgment in July 1979 and respondent placed the proceeds in an interest-bearing account.

Thereafter several post-judgment Motions were filed relating to the disbursement of the trust account funds. Between July and November 1980, several disbursements were made from the account to various creditors of the Guidos. A handwritten accounting dated September 1981 was submitted to the court, which resulted in an Order dated November 12, 1981, directing immediate disbursement in accordance with the accounting. Innumerable telephone calls by Mr. Guido to respondent failed to result in distribution of the funds, and respondent had failed to provide an updated accounting to Mr. Guido. Indeed, neither Mr. Guido nor his former wife, Carmen Guido, has received any funds from respondent.

The DRB held that with respect to these six complaints, respondent was "guilty of gross neglect, DR 6–101(A)(1); a pattern of neglect, DR 6–101(A)(2); failure to carry out contracts of employment, DR 7–101(A)(2); allowing statute of limitations to run on various clients' claims, DR 7–101(A)(3); and making misrepresentations to clients and failing to communicate with them, DR 1–102(A)(4) and (6).[1]

II

*Gener Matter*

The most serious claim against respondent arises from his handling of income-tax refund in the Gener matter. In 1983

[1]Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

respondent was retained to represent Mary Gener in her divorce action against her husband, John Gener. At a hearing held on October 25, 1983, the court determined the terms of the divorce, including equitable distribution of the marital assets. Specifically, with respect to the federal-income-tax refund received by the Geners, the court stated:

As far as the IRS refund is concerned, when the defendant left I find that there were the following debts: fuel, $587; one and a half months of the first mortgage of $445; two months of the second mortgage of $400. Those were the only provable items. They amount to $1,432. $1,432 out of the total of $1,940 will go to the plaintiff, that leaves a balance of $510—my numbers are wrong, leaves a balance of $510. Out of that $510 it will be divided in half, two fifty-five to the plaintiff; two fifty-five to the defendant. In effect, plaintiff will receive $1,687. The defendant will receive $255.

The court directed respondent to prepare an appropriate order setting forth the above-enunciated distribution. He failed to do so. Consequently opposing counsel prepared an Order entered on December 8, 1983, that provided as follows:

ORDERED that a certain IRS refund check in the amount of $1,940 and a certain Homestead Rebate check which was previously received by the plaintiff in the amount of $186.00 shall be divided between the parties as follows: $347.00 shall be paid to the defendant and $1,593.00 shall be paid to the plaintiff. From said $1,593, the plaintiff shall pay certain debts which arose from the operation of the marital abode prior to the date hereof. Said expenses are as follows: fuel $587.00; 1½ months of the mortgage payments due on the first mortgage $445.00; 2 months on the second mortgage $400.00; and it is further ORDERED that the attorney for the plaintiff shall pay said $347.00 to the defendant, as said IRS check was to be deposited in the Trust Account of the attorney for the plaintiff. The same shall be paid upon said check clearing the Trust Account of the plaintiff's attorney. Said attorney shall take whatever actions are necessary to collect said funds;

The Order also provided that both parties were to execute a proper listing agreement with a real estate broker so that the marital home could be sold promptly.

Respondent failed to distribute to the Geners the IRS refund and also failed to forward the listing agreement for the marital home to the broker. Therefore, in January 1984 Mr. Gener filed a Notice of Motion to enforce the judgment. In his motion, Mr. Gener requested that any counsel fees he incurred from this action be paid by Mrs. Gener. On receipt of Mr.

Gener's motion, Mrs. Gener retained Howard Siegel, Esq., as counsel. On that date Mr. Siegel wrote Mr. Sommers advising him that Mrs. Gener wished to substitute him as counsel in the divorce proceedings, and requested that respondent distribute the refund as set forth by the court orally on October 25, 1983, and as confirmed by its December Eighth Order. In his letter Mr. Siegel wrote:

> The most critical aspect of this matter concerns the sum of $1,940 which in accordance with Judge Krafte's order of December 8th, 1983 required the sum of $347 to be paid to the defendant and the balance of $1,593 be paid to Mrs. Gener so that she could pay two months that were in default on each of their mortgages and a fuel oil bill. Your refusal to release these monies has personally endangered the property owned by Mr. and Mrs. Gener and it is my intention to hold you personally responsible for any damages which may occur as a result of your failure to comply with the judge's order. Under no circumstances is any portion of the same to be used for the balance of any fee which might be owing to you.

Moreover, he added that "[a]s of this date Mrs. Gener has paid you the sum of $750.00 and you have not submitted a final bill indicating what additional sums are owed you."

Mr. Siegel attempted to contact respondent by telephone and letters. Finally Mr. Siegel advised the OAE of the failure of respondent to distribute the Gener IRS refund in accordance with the court's Order.

After a letter dated February 7, 1984, from the OAE and a court order from the Chancery Division entered February 8, 1984, respondent appeared in court on February 10, 1984, and issued his trust account checks for the required IRS distributions. Respondent's trust records disclose that on February 8, 1984, there were insufficient funds in his trust account to cover the checks. Sufficient funds, however, were deposited by February 14, 1984.

The OAE also in its February Seventh letter requested monthly bank statements of respondent's trust account from October 1983 to February 7, 1984. Respondent failed to produce the records and on April 4, 1984, the OAE notified respondent that an accountant would audit his trust account. Respondent failed to cooperate or respond in any way with the ac-

countant. Under a threat of suspension contained in OAE's letter to respondent of May 21, 1984, respondent finally appeared on May 31, 1984, at the OAE's office. However, at that time he failed to bring all the required records.

On June 6, 1984, respondent returned to the OAE's office. At that time he was cooperative and responsive to the inquiries of the OAE auditor. Respondent advised the OAE auditor that due to personal problems on July 21, 1983, the Internal Revenue Service had levied on his attorney business account in the amount of $1,489.24. Hence, he admitted that of necessity he used his trust account for his personal expenses.

A review of respondent's trust account statements discloses that he deposited the Gener IRS refund check of $1,942.00 in his trust account on November 2, 1983. He made checks totalling $1,500.00 on his trust account from the date of deposit November 2, 1983, to November 23, 1984, leaving a total of $445.72 in his trust account on November 30, 1984. For example, in the month of November, after depositing the IRS refund, he drew one check on November 7, 1983, to Denise Sommers, his wife, for $200.00, and another check on November 11, 1983, to Arthur W. Hoffman for $600.00, which represented a payment on a personal judgment against him. Likewise, respondent continued to draw personal checks for office expenses and other personal expenses on his trust account. The closing balance in respondent's trust account on December 30, 1983, was $316.67, and in January was $835.17. These bank statements establish that funds were unavailable in the trust fund to pay the Geners their respective share of the IRS refund claim. Indeed, when respondent made the checks dated February 10, 1984, to the Geners, there were insufficient funds to pay the refund claims.

On October 22, 1984, the OAE filed a formal complaint against respondent alleging that his handling of the Gener matter constituted gross negligence, violating *DR* 6–101(A)(1); misappropriation of trust funds, violating *DR* 9–102(B)(4), *DR*

1–102(A)(3), *DR* 1–102(A)(4) and *DR* 1–102(A)(6); failure to bring all the required records at audit, violating *DR* 9–102 and *DR* 1–102(A)(5); failure to keep required records, violating *DR* 9–102(B)(3) and *DR* 6–101(A)(1); misuse of his attorney trust fund to circumvent an Internal Revenue levy on his business account, violating *DR* 1–102(A)(5); and commingling of his funds, violating *DR* 9–102(A).

Respondent did not file an answer to the OAE's complaint. At a hearing before the DEC held on January 14, 1985, respondent appeared and requested to be excused from the hearing. The request was granted and he was represented at the hearing by Charles Melli, Esq. At the hearing, Mr. Melli stipulated that respondent was offering no factual defense with respect to the complaints concerning the Gullone, Jazwinski, Berkey, and Dispoto matters, and the formal complaint filed by the OAE, and admitted the truth of the allegations set forth in the complaints and documents attached to them. Respondent's attorney asked for a continuance to have an opportunity to present as a mitigating factor evidence of respondent's alcoholic dependency. On March 1, 1985, respondent entered into a consent order temporarily suspending him from the practice of law. That Order remains in effect.

At the hearing of the DEC held March 20, 1985, a detailed report of Dr. David J. Gallina, a Diplomate of the American Board of Psychiatry and Neurology, was presented as evidence of respondent's alcohol problem. Dr. Gallina concluded that "[b]ased on the information presented during the course of this evaluation, it appears that alcohol influenced Charles Sommers in the actions that caused his legal difficulty. Specifically the inappropriate behavior exhibited throughout his law practice was directly related to illness." He determined, however, that respondent was a "recovering alcoholic." The record also establishes that Mr. Sommers was hospitalized at Sunrise House, Lafayette, New Jersey, on August 24, 1984, and discharged on September 21, 1984. In connection with his own divorce pro-

ceedings, respondent has been ordered by the court to seek treatment or be incarcerated.

The DEC noted that respondent had stipulated the facts in several of the complaints to be true, and unanimously determined that respondent should be severely disciplined. Nonetheless, the DEC recognized that respondent was a "relatively sick man by way of alcoholic abuse," and recommended that the DRB should consider his physical and psychiatric condition in considering appropriate disciplinary sanctions.

The DRB concluded that while "alcohol may well have contributed to respondent's 'loss of critical control of judgment,'" "[t]here is nothing in the record, however, which would indicate that respondent suffered such a loss of competency, comprehension or will, as would excuse his conduct." Thus, the DRB concluded with regard to the Gener matter that "[r]espondent clearly formed the intent to utilize his trust account for personal purposes to thwart the IRS levy on his business account. His actions were knowing." Accordingly, the DRB unanimously recommended his disbarment for misappropriation.

This Court issued to respondent an Order to Show Cause why he should not be disbarred or otherwise disciplined. At a hearing before this Court, respondent argued for the first time in any disciplinary hearing that he had a claim of right to the Gener funds—that is, that such funds represented his fees for legal services rendered to Mrs. Gener and her sons. We remanded the matter to the DEC for an expedited hearing on respondent's claim of right.

At the hearing Mrs. Gener, her attorney, Mr. Siegel, and Mr. Sommers testified. Mr. Siegel testified that on respondent's receipt of his letter of January 20, 1984, respondent called him and indicated that part of the reason the IRS refund had not been disbursed was that he felt that certain monies were owed to him by Mrs. Gener.

At the remand hearing Mrs. Gener advised the DEC that she called respondent numerous times about the refund check, but

respondent never answered her calls. Finally, when he was advised that she no longer was going to use his services, respondent then told her he was going to take his fees out of the refund check. She testified that she asked him to wait until the matter was completely resolved and the sale of the house was accomplished, at which time there would be a resolution of the fee situation. On January 10, 1984, in response to this conversation, Mrs. Gener wrote the following letter to respondent:

Dear Mr. Sommers:

You have in your possession a federal income tax check for the amount of $1,942. On October 25, 1983, Judge Krafte authorized this check to be placed in your possession, to be deposited as my attorney, and then to be turned over to me so I could then proceed to pay my husband John Gener's back bills: First mortgage, $648, second mortgage, $500, oil bill $587, etc. etc.

In our telephone conversation back in December you told me you were keeping this check as your fee for representing me in my divorce case. In good faith I paid you $500 back in September 1982. At that time your total fee was a thousand dollars. Agreement was made that the balance was to be paid at the end of your services.

I feel at this time it is unethical how you are handling this matter and I am asking you to please forward this check directly to me, along with an itemized bill for your services.

Very truly yours, Mary Gener.

Mr. Sommers testified at the hearing that he had quoted Mrs. Gener a figure of $750 plus expenses for an uncontested divorce. This divorce was contested. Moreover, he recalled that he received $500 from Mrs. Gener and her mother. He also alluded to the fact he had represented Mrs. Gener's sons and was owed money for that representation.

Respondent offered no written retainer agreement with respect to the fees for the divorce or any correspondence reflecting an agreement with respect to his fees for services to be rendered. Nor did he ever present any statement for legal services rendered to Mrs. Gener or rendered to her sons.

Indeed, when it was pointed out that by respondent's own account Mrs. Gener did not owe him the total amount of the refund, he testified as follows:

> Oh, yes, whatever it is. I'm not exactly sure as to the amount I quoted the lady as to how much she owed me. But I was confident at the time that I was owed the money.

When questioned as to why he did not obey the court's order set forth in the record on October 25, 1983, he testified:

> Now I did not understand that at the time it was orally given in court to be a statement that these funds were to be specifically directed for that payment.

Respondent offered no explanation of why he did not obey the December Eighth written court order. Of course, by that date the total refund amount had been used for his own personal use.

Nor does respondent offer any explanation of why he did not pay Mr. Gener his share of the refund. Instead, when respondent was asked why he felt he was entitled to John Gener's portion of the refund check, he replied:

> A  I thought that there had been another adjustment on account of his having cashed another check that was due to his wife. I wasn't aware that he was due to get any part of that back until I saw. . . .
>
> Q  I'm sorry. Go ahead.
>
> A  —until I saw that order.
>
> Because I know he had cashed several other checks. I wasn't aware that he was due to get that back. That wasn't in my knowledge.

The DEC concluded based on its review of the record that respondent did in fact knowingly misappropriate funds in his trust account that belonged to Mary Gener and to John Gener.

### III

Our independent review of the record confirms by clear and convincing evidence that respondent is guilty of unethical conduct with respect to all the complaints filed against him. Nonetheless while respondent's conduct with respect to the Gullone, Jazwinski, Berkey, Dispoto, Conway, and Guido matters constitute serious violations of the disciplinary rules (*supra* at 210–214, they are not sufficient to result in respondent's disbarment or suspension for a period longer than his present suspension.

Accordingly, the issue here is whether there is clear and convincing evidence that respondent knowingly and willfully misappropriated his clients' funds and the escrow funds he was holding for Mr. Gener. Based on our independent review of the record, we find that evidence clearly and convincingly establishes that respondent misappropriated Mrs. Gener's funds and Mr. Gener's funds. Our review of respondent's actions lead us to conclude that respondent did not have an honest belief that he was entitled to the refund claim as his fee.

■■ Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 *N.J.* 451, 455 n. 1 (1979). As we stated in *In re Noonan*, 102 *N.J.* 157 (1986), knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Id.* at 159–60.

The lawyer's subjective intent to borrow or steal, the pressures on the lawyer leading him to take the money, the presence of the attorney's good character and fitness and absence of "dishonesty, venality, or immorality" are all irrelevant. *In re Noonan*, 102 *N.J.* at 160; *see Matter of Warhaftig*, 106 *N.J.* 529, 533 (1987); *In re Lennan*, 102 *N.J.* 518, 523–24 (1986); *In re Wilson, supra*, 81 *N.J.* at 458.

Respondent claims that he honestly believed he was entitled to Mrs. Gener's share of the refund as part of his fee. We find little support for this assertion in the record. The court transcript clearly states the manner in which the IRS refund was to be distributed to the parties and the reason for the distribution, namely, to pay unpaid mortgage and fuel bills. Moreover, assuming the respondent did not accurately hear the court's oral order, the court's distribution schedule was set forth in the December Eighth written Order. The record reveals no reason

why the respondent did not obey that Order. Only after a court order and a threatening letter from the OAE did respondent finally comply with the court's Order. *See Matter of Brown*, 102 *N.J.* 512, 517 (1986) (even assuming respondent's problem originated with a client who passed a bad check, there was no excuse for his constant dipping into trust account for four and a half years thereafter). So too, there is no excuse for respondent's failure for two months to distribute the refund as directed by the court.

Furthermore, to date respondent has failed to set forth in any document or at any disciplinary hearing the services he performed for Mrs. Gener or the amount he claims Mrs. Gener owes him for his legal services. He never sent a bill to Mrs. Gener. Moreover, there is no evidence of the legal services respondent allegedly performed for Mrs. Gener's sons, other than his vague statements, no statement of fees he claims for these services nor any explanation why Mrs. Gener would be responsible for the legal fees of her adult sons. Hence, this case is not like *In re Arthur D. Reiss*, 101 *N.J.* 475 (1986), or *In re Stein*, 97 *N.J.* 550 (1984). In those cases the attorneys withheld their clients' funds in order to pay their fees; but while the fees were disputed and unapproved, they were the subject of discussion between the parties. Moreover, the attorneys did not use the withheld funds to pay their personal expenses.

In sum, an analysis of the record compels the conclusion that respondent used the Gener refund for his personal expenditures. Initially, he stipulated to this through his lawyer at the DEC hearing on January 14, 1984. Further, in his testimony on February 23, 1988, he acknowledged he had reviewed the OAE complaint and exhibits and advised his attorney that the OAE complaint was correct. One is struck with the unavoidable conclusion that respondent's claim of right theory was developed as an *ad hoc* justification for his actions.

Further support for this conclusion is found in respondent's actions regarding Mr. Gener's portion of the IRS refund claim.

Respondent was not taking Mr. Gener's portion of the refund as an advance of his fee. Mr. Gener owed respondent no fee. Respondent's explanation that he felt there was some adjustment between the Geners and hence did not think Mr. Gener was entitled to any part of the refund is meritless. Respondent offers no pausible claim of right to Mr. Gener's refund.

The court directed respondent to act as a depository for the IRS refund check until he distributed Mr. Gener's portion of the refund to him. He received this refund as an agent or trustee for Mr. Gener. Without question, respondent misappropriated Mr. Gener's portion of the refund for his own purposes. *See Matter of Hollendonner*, 102 *N.J.* 21, 28 (1985) (there is a parallel between escrow funds and client trust funds, and an attorney who knowingly misused escrow funds will be subject to the disbarment rule).

We recognize that during this period respondent was facing great personal pressures, both domestic and financial. Likewise, we recognize that these personal problems were caused by or greatly compounded by respondent's severe drinking problem. As in *Matter of Hein*, 104 *N.J.* 297, 302 (1986), we recognize that respondent's "alcoholism contributed to the loss of critical control of judgment, but cannot conclude that the evidence warrants a departure from the principle that we set forth in *In re Wilson*." Dr. Gallina opined that respondent's alcohol problem influenced him to undertake the actions and inappropriate behavior that caused his legal difficulties. As was the case in *Hein*, evidence of respondent's alcoholism demonstrates alcohol dependency, but does "not demonstrate to us the kind of loss of competency, comprehension, or will that can excuse the misconduct." *Id.* at 303. The evidence falls short of suggesting that when the respondent used the IRS refund for his personal expenditures, he was unable to "comprehend the nature of his act or lacked the capacity to form the requisite intent." *Id.* at 303.

On consideration of all the circumstances, we conclude that the appropriate discipline is disbarment. Respondent is direct-

ed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

CLIFFORD, Justice, dissenting.

I agree with the Court that although respondent's conduct in respect of the Gallone, Jazwinski, Berkey, Dispoto, Conway, and Guido matters constituted serious ethical infractions, suspension for a period not longer than the time running from the date of temporary suspension, namely, March 1, 1985, is sufficient discipline. The issue then becomes whether a knowing misappropriation in the Gener matter has been established, as the Court concludes it has, by clear and convincing evidence. I think not.

Did respondent *intend* to appropriate client funds to his own use, knowing that they were client funds and that he was not entitled to them? I would have to acknowledge that on this record one might very well determine that he did. On the face of the printed page respondent's explanation is not exactly overwhelming: "At the time I had disbursed the funds to myself I believed that I was owed that money and I still believe I was owed that money. * * * I certainly didn't intend that [$]750 was going to be my payment for a fully contested divorce that would include two days." But his denial is enough when one keeps in mind the other distractions in respondent's professional existence and personal circumstances—both a shambles—to bring me up short of a conclusion that respondent's knowing misappropriation has been established by clear and convincing proof. Maybe the explanation does not inspire in this observer a sense of respondent's professional distinction, but it does leave an impression of credibility.

We are trying to divine respondent's state of mind: what did he "know" and what did he "intend"? His transgression must be established by clear and convincing evidence. And contrary to the usual function of an appellate court, in which we sit to

determine whether there is sufficient evidence in the record to support a lower court's conclusions and in which we ordinarily defer to the factfinder's appraisal of credibility, we are obliged in disciplinary proceedings to make our own independent conclusions on all disputed factual issues, including questions of credibility. (The exercise is, incidentally, therapeutic, a bit of an eye-opener, a reminder that in that respect, at least, appellate judges generally have the less uncomfortable, even easier, task than our colleagues on the trial bench, who have to make "credibility" calls every day.) Ultimately, then, I must fall back on my own appraisal of—almost visceral reaction to—respondent's denial.

Were I engaged in the conventional appellate-review function, I might very well agree with the Court's result. Respondent surely did not do right by Ms. Gener. But when, in the context of these proceedings, this forlorn, luckless, disorganized, hapless lawyer tells me that he did not knowingly take somebody else's funds, then no matter how thin his proffered justification may be when viewed from the rational perspective of more "conventional" lawyers, I cannot conclude that the contrary proposition has been established by clear and convincing proof. I am reluctant to admit, as I must, that the very same evidence involving a different respondent might bring me to the opposite result—reluctant, because that kind of *ad hominem* basis for a determination does not do much for stability and consistency in our disciplinary adjudications. What can I say? I believe this respondent. I may not believe the next one. Factfinders—trial judges and juries—make those kinds of appraisals every day.

I would suspend for the period of temporary suspension, and reinstate only on the condition of a proctorship arrangement to be approved by the Office of Attorney Ethics.

*For disbarment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK and GARIBALDI—4.

*For suspension*—Justices CLIFFORD, O'HERN and STEIN—3.

## ORDER

It is ORDERED that CHARLES W. SOMMERS of HACK-ENSACK be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that CHARLES W. SOMMERS, JR. be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.