596 A.2d 733

IN THE MATTER OF MICHAEL A. KONOPKA,
AN ATTORNEY AT LAW.

Argued October 24, 1989—Decided October 4, 1991.

*Thomas J. McCormick,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Douglas H. Burg* argued the cause for respondent (*Frank A. Ferrante,* attorney).

PER CURIAM.

This attorney-disciplinary proceeding arose from a random audit of the trust funds of respondent, Michael A. Konopka. As a result of the audit, the Office of Attorney Ethics (OAE) filed a complaint against respondent charging him with misappropriation of clients' funds, as well as failure to maintain required records and failure to safeguard clients' funds. More specifically, a formal six-count ethics complaint filed in January 1988 against respondent charged him with violations of the *Rules of Professional Conduct,* namely, the failure to maintain trust-account records, commingling personal and client funds, failure to safeguard client funds, and knowing misappropriation of client funds, contrary to *Rules of Professional Conduct* 1.15 and 8.4.

Respondent entered a complicated family arrangement whereby he agreed with his parents that he would keep current the payments on two mortgages that covered his parents' homestead and a two-family house that his soon-to-be-divorced sister owned with her husband. In brief, his parents did not want the family to lose the two-family income property. They mortgaged their own home for $30,000 and turned the funds over to respondent to clean up the arrearages on the first mortgage on the sister's home and other obligations and to buy out the sister's husband. In exchange for living in a unit of the two-family house, respondent was to collect rent from the other tenant and pay the mortgages and other bills related to the properties with those funds and his own funds.

Respondent maintained a ledger sheet entitled "Konopka, Paul and Eva, to Spencer Savings and Loan," which, according to the Disciplinary Review Board (DRB), documented a client

trust fund that respondent had established for his parents. The audit of respondent's trust account, covering approximately a three-year period, revealed that respondent had made disbursements from the Konopka account for the Konopka properties in excess of the deposits in the account. Moreover, on many occasions, there were deficits in the accounts of respondent's other clients at the same time that his disbursements exceeded his deposits in the Konopka account. As found by the DRB,

> from August 20, 1982 through September 16, 1985, respondent regularly made payments related to his parents' property that exceeded the amount on deposit [and on] at least 26 occasions during that three-year period, the *Konopka* account reflected a negative balance, in amounts ranging from $1,461.19 on August 20, 1982 to $6,374.37 on September 25, 1984. These negative balances resulted in the invasion of clients' funds in the *Edone, Wiegand, Armagost, Koceski,* and *Arslan* matters.

The key issue is whether the trust-fund shortage was the result of knowing misappropriation or the product of inadvertent error or gross neglect in respondent's handling of the funds in his accounts. The question is critical because a knowing misappropriation almost invariably calls for disbarment. *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). Respondent denied any such knowledge.

Both the District Ethics Committee (DEC) and the DRB found that a knowing misappropriation of clients' funds had occurred. We disagree. Based on our independent review of the record we find that the evidence of respondent's conduct falls short of establishing clearly and convincingly the knowing misappropriation that the *Wilson* sanction seeks to deter.

I

The theory of the OAE's case was that the imbalance in respondent's accounts clearly established the *Wilson* violation. To summarize the disciplinary counsel's opening remarks before the DEC:

> And the allegations are simply this: That Mr. Konopka, the respondent here, kept bad books.

> But we allege that it doesn't just—it wasn't simply * * * that he failed to maintain his client ledger sheets properly and didn't have a running balance, but rather that his failure to maintain records impacted upon other clients' funds that were in his trust account.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> The bottom line though, was that when Mr. Prihoda [the OAE's auditor] looked over the attachments—the so-called Konopka ledger sheets, and made up a running balance, he found that the account was out of trust on many occasions in the four year period that he made his analysis.
>
> * * * And logic would tell us that if that account was out of sync, if there were more money disbursed from that account than had actually been received in it, then it's likely that other client funds were used to make—you know for these excess disbursements. And that's, indeed, what the proofs will show * * *.

Although there is no question that the entrusted funds did not remain intact, there is a genuine question whether respondent knowingly misappropriated those funds.

█ In a long series of cases, we have emphasized the need for clear and convincing proof that a knowing misappropriation has occurred. *In re Simeone*, 108 *N.J.* 515, 521–22, 531 *A.*2d 729 (1987), summarizes the principles that we apply in determining whether the case is more than one of "shoddy bookkeeping" and instead rises to the level of one of knowing misappropriation. We noted there that in a case such as *In re Orlando*, 104 *N.J.* 344, 517 *A.*2d 139 (1986), repeated and frequent instances of being out of trust did not necessarily add up to a knowing misappropriation. Those principles have been applied uniformly. See *In re Librizzi*, 117 *N.J.* 481, 569 *A.*2d 257 (1990); *In re Gallo*, 117 *N.J.* 365, 568 *A.*2d 522 (1989); *In re Johnson*, 105 *N.J.* 249, 520 *A.*2d 3 (1987).

At the same time, we have not retreated one bit from the principle that knowing misappropriation, when shown by clear and convincing evidence, will warrant the *Wilson* sanction of disbarment. See *In re Sommers*, 114 *N.J.* 209, 553 *A.*2d 789 (1989); *In re Warhaftig*, 106 *N.J.* 529, 524 *A.*2d 398 (1987).

To compare this case to *In re Skevin*, 104 *N.J.* 476, 517 *A.*2d 852 (1986), *cert. denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987), in which an attorney who knew that he had

not yet received personal-injury settlement checks nonetheless drew advance fees from his account, is inappropriate. In this case there is no clear and convincing evidence that respondent was systematically taking advance fees or borrowing from one client's fund to make up for a shortfall in another's.

Were there such proof, we agree that respondent's conduct would merit disbarment. The disciplinary panels, in reaching critical conclusions that respondent had knowingly misappropriated clients' funds, relied on two pieces of evidence. We find that that evidence falls short of the necessary clear and convincing proof. The DRB summarized the two bases as follows:

> In the *Konopka* ledger, in respondent's own handwriting, the phrase "balance forward from page 22" appears, followed by the stated balance of $153.81. Two lines down, again in respondent's handwriting, two $500.00 disbursements are listed, one on May 24, 1982 and the other on June 1, 1982. No deposit was made to cover these excessive disbursements until August 2, 1982, sixty days later, when $385.00 was deposited. This deposit decreased the shortage to $461.19.

> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> In the *Edone* matter, respondent deposited $5,000.00 into his trust account on January 24, 1983. This $5,000.00 was subsequently paid over to Ms. Edone on February 15, 1983. However, as of February 13, 1983, the trust account reflected a balance of $3,867.39, creating a $1,132.61 shortage in the *Edone* funds. On the same day the $5,000.00 was disbursed to Mrs. Edone, respondent deposited $1,500.00 of his personal funds into the trust account, thus bringing the trust account total from $3,867.39 to $5,367.39, an amount sufficient to cover the disbursement.

We are unable to agree that those transactions establish clearly and convincingly the knowing misappropriation that is predicate to disbarment.

As noted, the DRB relied on what we believe are two telltale disbursements from the Konopka family account of $500 each in May and June 1982. The supposition is that because of the preexisting $153 "balance forward," respondent was plainly aware that that account had a deficit, but blindly invaded other clients' funds for the purposes of the Konopka family account. But the strongest criticism of respondent found in the report of Mr. Prihoda, the OAE's auditor, was that respondent had never reconciled his accounts. The auditor indicated: "One column

[of the ledger sheets] accounted for receipts and the other column accounted for disbursements. There was no third column to show the current balance of the ledger accounts at any given time." The OAE did not prove exactly how or when Konopka made the notation of a running balance at the top of the ledger sheet. Mr. Prihoda did not testify in these proceedings. The OAE simply relied on the submission of the reports. When questioned on the knowledge implied by the recording of disbursements immediately following the inadequate balance, respondent replied, "The checks probably were written, and then I entered them in the book." There is simply no proof of when Konopka made the "balance forward" entry in relation to the issuance of the checks.

With respect to the asserted imbalance in the Edone matter, the fact that respondent made a deposit of $1500 when he made the disbursement to that client does not establish that he knowingly misappropriated clients' funds. In fact, we have criticized an attorney when he has not made up deficits in his account. See *In re Brown*, 102 *N.J.* 512, 509 *A.*2d 176 (1986) (respondent continually invaded trust funds of one client to pay another). In addition, we know from the record that after the OAE audit, respondent engaged Edone, the very client whom he is accused of betraying, to perform the accounting services necessary to reconcile respondent's accounts. We believe it unlikely that Konopka would knowingly invade Edone's funds and then hire that client as an accountant to audit respondent's own books.

In short, there is no clear and convincing proof that respondent knew that he was invading clients' funds when he made those disbursements. In fact, the first count of the OAE's complaint showed that he had regularly used the trust account to receive personal fees. He later recognized that to be an inappropriate form of accounting for his professional fees. One such inadequacy was that respondent did not draw fees from his trust account for deposit to his attorney account, but rather drew directly on the trust account. Thus, at any given

moment there may or may not have been uncollected fees in the trust account. In addition, respondent did not use his trust account for his own venal purposes. The two $500 disbursements were clearly related to the purposes of the Konopka family account. *Compare In re Jacob*, 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984) (attorney misappropriated client funds " 'to sustain his dual life style....' "). There is no evidence of such corruption here.

## II

Our opinion in this case should serve then to emphasize our refusal to disbar in knowing-misappropriation cases unless we are totally satisfied that the proofs are clear and convincing But despite our care in applying the *Wilson* rule, three members of this Court have questioned that rule in this case. We are not certain of the extent of their concerns. The concurrence agrees that "the *Wilson* rule is the right rule for the vast majority of knowing-misappropriation cases," *post* at 241, 596 *A.*2d at 741, and that it should "continue to guide the Court in determining the discipline to be imposed." *Post* at 259, 596 *A.*2d at 752.

To debate the position of the concurrence is perhaps premature, since the concurrence's rule has not yet been applied in a knowing-misappropriation case. The concurrence suggests only that there should be exceptions to *Wilson* "under special circumstances," *post* at 259, 596 *A.*2d at 752, exceptions "to accommodate unique circumstances," *post* at 241, 596 *A.*2d at 741, that should be "sensible and limited exceptions," *post* at 257, 596 *A.*2d at 751.

One clue to the scope of the concurrence's possible modification of *Wilson* may be found in the example that the concurrence draws from this case. Although agreeing with the Court's opinion that knowing misappropriation was not clearly and convincingly proved, the concurrence says that even if respondent was *guilty* of knowing misappropriation of his

clients' funds, he should not be disbarred. *Post* at 249–251, 258–259, 596 *A*.2d at 746–747, 751–752. The concurrence argues that "[e]ven if this record is read to sustain the OAE's contention that respondent knew that funds of other clients were being used to make mortgage payments for his parents and sister, there is serious doubt whether respondent understood that his method of operating the account was prohibited." *Post* at 249, 596 *A*.2d at 746.

No more radical exception to *Wilson* could be designed. Stripped of euphemism (the concurrence calls it ignorance of "trust-account management," *post* at 241, 596 *A*.2d at 741), essentially the concurrence says that a lawyer who misappropriates clients' trust funds should not be disbarred if the lawyer did not understand that stealing those trust funds was wrong. Such a defense (never seriously pressed by respondent) would seem to support the contrary position: an attorney who does not know that to take a client's funds is wrong ought no longer be practicing law.

That the concurrence would, unnecessarily, posit that defense even hypothetically as an example of an appropriate exception to *Wilson* suggests perhaps the depths of its dissatisfaction and the potential damage to the public's protection against misappropriation if its exceptions become the law.

The main basis stated for the position of the concurrence lacks support in our decisions. The concurrence argues that our decisions following *Wilson* have been rigid and inflexible, suggesting that we have disbarred automatically, without thoughtful reflection and without consideration of the circumstances. In fact, all we have done is adhere consistently to *Wilson* 's central premise: that a lawyer who knowingly misappropriates a client's money must be disbarred—not because the lawyer is necessarily irremediably corrupt and evil, but because to do otherwise risks the worst possible damage to the judiciary: loss of public confidence in the bar and in this Court.

This Court's unwavering position has been that when you take a client's funds without the client's permission, it is wrong, totally wrong, whether or not you intend to return the money, whether or not indeed you *do* return it. Practically every attorney who knowingly misappropriates intends to return the money, and many do, usually by taking it from another client, and the theft is often not discovered until the attorney gets to the end of the road where there is that last client from whom he or she has taken money but for whom he or she can find no new funds to steal from other clients. This "lapping," the use of one client's account to make up for a shortage in another, repeated on and on, and sometimes undetected, is the most common form of knowing misappropriation. Clients should not have to endure the agony of worrying whether the lawyer will indeed make good on his or her intent to return the client's money, or whether the lawyer's family will be able to, or whether the lawyer will be able to make up the money from other clients.

The other justifications for *Wilson,* including the fact that the offense is clear and well understood, both by the lawyer and by the public, and universally regarded as irredeemable, all set forth in that opinion, are both supportive of and secondary to its major premise, the maintenance of public confidence. From case to case this Court has examined and reexamined the rationale of *Wilson,* its implications and its application, and concluded that it is correct—not because we are inflexible, but because we have found it to be correct in case after case. We have attempted to be principled while continually monitoring the practical impact of those principles. And we have been satisfied that they achieve the goals of *Wilson* and that those goals justify the results of each case. And if we have not been "pragmatic," *post* at 241, 596 *A.*2d at 741, it is because we have yet to see how pragmatism justifies discarding those principles and goals.

The concurrence says that our inflexibility is such that we routinely order disbarment in *Wilson* cases simply because the

attorney's books are not in order. "If knowing misappropriation equates with disbarment, then there is no need for the OAE, the DECs, the DRB, or this Court to look beyond book-keeping entries in the trust ledger to decide misappropriation cases. Never mind that we are extinguishing a lawyer's professional life permanently and irrevocably." *Post* at 252–253, 596 *A.*2d at 748. The charge is unwarranted. We insist, in *every Wilson* case, on clear and convincing proof that the attorney *knew* he or she was misappropriating. Obviously, we consider the attorney's records, if relevant, along with all other testimony, but if all we have is proof from the records or elsewhere that trust funds were invaded without proof that the lawyer intended it, knew it, and did it, there will be no disbarment, no matter how strong the suspicions are that flow from that proof. See *supra* at 228, 596 *A.*2d at 734, noting, for example, *In re Librizzi, supra,* 117 *N.J.* at 490–91, 569 *A.*2d 257; *In re Gallo, supra,* 117 *N.J.* at 371–73, 568 *A.*2d 522; and *In re Simeone, supra,* 108 *N.J.* at 521–23, 531 *A.*2d 729.

A recurring theme of the concurrence is the closeness of knowing-misappropriation cases and the unusual difficulty it discerns in reaching the factual conclusion that knowing misappropriation has or has not occurred, as if some abstruse principle of accounting practice were trapping unwary innocent attorneys. Some of the Court's requirements for record-keeping and accounting may be difficult for some to understand, even to comply with, but that has nothing to do with knowing misappropriation. Even the most untutored, naive attorney is fully equipped to understand the knowing-misappropriation prohibition. All the lawyer needs to understand is what it means to steal or to "borrow" without permission. For instance, when a lawyer withdraws more money from a client's trust account than is deposited, the lawyer needs no course in accounting to realize that if the withdrawal is not covered, the difference is coming from some other client's account. It can happen, it sometimes *does* happen, that a lawyer simply was unaware of the trust invasion, or more accurately, usually, that clear and

convincing proof of his or her knowledge has not been provided, but not because there is anything complicated or subtle involved. *In re Orlando, supra,* 104 *N.J.* 344, 517 *A.*2d 139.

The record, since *Wilson,* of misappropriation-disbarment decisions shows overwhelming unanimity. Of thirty-six opinions ordering disbarment, thirty-three were unanimous, two were six-to-one (including one opinion, *In re Fleischer,* 102 *N.J.* 440, 508 *A.*2d 1115 (1986), involving three attorneys), and one was four-to-three. In addition, eighteen attorneys were disbarred by order for knowing misappropriation, all of which disbarments were unanimous; and finally, since *Wilson* there have been 107 disbarments either through resignation or by consent arising from knowing misappropriation. Put differently, of the 163 orders disbarring attorneys for knowing misappropriation since *Wilson,* only five (including three issued in *Fleischer*) were not unanimous. Furthermore, we have been unanimous when *rejecting* a claim of knowing misappropriation, with the sole exception of one case (*In re Perez,* 104 *N.J.* 316, 517 *A.*2d 123 (1986)).

For more than ten years this Court has grappled with the problem of knowing misappropriation, the harshness of disbarment on occasion, and the justification for that harshness. After the most serious reflection, we have consistently adhered to *Wilson. In re Steinhoff,* 114 *N.J.* 268, 553 *A.*2d 1349 (1989) (drug dependency); *In re Nitti,* 110 *N.J.* 321, 541 *A.*2d 217 (1988) (compulsive gambling); *In re Skevin, supra,* 104 *N.J.* 476, 517 *A.*2d 852 (family hardship). It is an adherence based on principle and on policy, carefully thought out; but if the rule is wrong, the issue is too important to be dealt with by suggesting the rule requires undefined exceptions. The uncertainty, inevitably created, damages its deterrent impact.

The judiciary's system in this state for disciplining the bar is strong and effective. Its rules and procedures are calculated both to educate and to deter. Our "bounced check" rule (requiring banks to inform the OAE whenever an attorney

draws a check on a trust account and the check is returned for insufficient funds) is one of eleven in this country. Our rule of invariable disbarment in knowing-misappropriation cases has been followed by but few states.[1] The result is an attorney disciplinary system second to none. Bumsted & Guttman, "New Jersey leads nation with stringent discipline," *Beyond The Law,* Gannett News Service Special Report, pt. II at 12 (1986).

Improvement, of course, is possible, but suggestions have almost uniformly been in the direction of further *strengthening*—including most recently the recommendations of the ABA Commission on Evaluation of Disciplinary Enforcement. The calls for change in lawyer discipline do not include any demand by the bar for easing the rules of their enforcement. Most certainly, they do not include any request by the New Jersey bar for any change in the knowing-misappropriation rule. Quite the contrary, the New Jersey State Bar Association has strongly supported the invariable imposition of permanent disbarment for knowing misappropriation.

> We wish to state without equivocation that it is the sense of this Committee that a lawyer who steals a client's property has committed the gravest breach of trust and committed an assault on the reputation of every lawyer of our State. We recommend that such conduct, without exception, warrants immediate and permanent disbarment, criminal prosecution and punishment which is swift, sure and severe. * * * [T]he Committee * * * unreservedly endorses the holding of *In re Wilson* * * * and urges its strict and uniform application to all cases of lawyer theft of a client's property.
>
> [New Jersey State Bar Association, *Report of Select Committee to Review Standards for Safeguarding Clients' Property* 1-2, 6 (1983).]

In this state, the organized bar wants more professionalism and a higher standard of ethics just as much as the public does. It would be ironic were this Court to give clients less protection from lawyers who steal client funds than the bar itself says is necessary.

---

[1]See *In re Addams,* 579 *A.*2d 190 (D.C.App.1990); *In re Marks,* 72 *A.D.*2d 399, 424 *N.Y.S.*2d 229 (1980); *State of Oklahoma, ex rel. Oklahoma Bar Ass'n v. Raskin,* 642 *P.*2d 262 (Okla.1982); *Carter v. McCarthy,* 544 *A.*2d 149 (R.I.1988).

When a lawyer takes clients' money, the potential devastation inflicted on the clients and their families is incalculable and unpredictable. The lawyer who intends to return the money may never be able to do so. A lawyer who takes clients' funds puts innocent families at risk of total ruin. That total ruin of the client results from total trust in the lawyer. The New Jersey State Bar Association's voluntary creation in 1961 of a fund, among the first in the nation, now called the New Jersey Lawyers' Fund for Client Protection and now administered by the Court, to compensate the victims of such misappropriation is clear testimony to the horrendous quality of the offense.

We are convinced that public confidence in the bar requires that a lawyer who knowingly takes a client's money, no matter what the reason, should never again practice law. We are equally convinced that the public believes that once that rule is clear, lawyers will be much less likely to take their clients' funds, no matter what the reason. This Court agrees with that judgment, both on the merits and on its implications concerning public confidence in the disciplinary system.

That from 1980, when *Wilson* was decided, to 1991, a period during which the attorney population of New Jersey doubled, the number of attorneys whose misappropriation of clients' funds generated claims each year seems to have remained remarkably stable is of some significance.[2]

---

[2]Number of attorney claims paid by the New Jersey Lawyers' Fund for Client Protection (formerly Clients' Security Fund) 1980 to 1990:

| Year | Number of Attorneys |
|------|---------------------|
| 1980 | 13 |
| 1981 | 12 |
| 1982 | 11 |
| 1983 | 9 |
| 1984 | 10 |
| 1985 | 9 |
| 1986 | 10 |
| 1987 | 12 |

Given the apparent success of the *Wilson* rule, its acceptance by the public and the bar, the measured consistency of our application, and our continued concern for the efficacy of attorney discipline, no change is in order now.

### III

In sum, respondent's conduct did not amount to a knowing misappropriation subject to the *Wilson* rule. Respondent's conduct differed from the conduct displayed in *In re Fleischer*, *supra*, 102 *N.J.* 440, 508 *A.*2d 1115 (one respondent acknowledged use of clients' funds and intentionally designed a bookkeeping system that prevented respondents from knowing whether they were using clients' funds); in *In re Warhaftig*, *supra*, 106 *N.J.* 529, 524 *A.*2d 398 (respondent acknowledged that with full knowledge he was violating the rules, he withdrew advance fees because of his cash-flow problem); and in *In re Brown*, *supra*, 102 *N.J.* 512, 509 *A.*2d 176 (respondent, for four years, knowingly invaded clients' trust funds through a "lapping process" whereby on a routine basis he designated funds of one client to pay for another client's needs and for office expenditures).

█ Respondent's conduct is more analogous to the conduct of the respondents in two recent cases, *In re Librizzi, supra*, 117 *N.J.* 481, 569 *A.*2d 257, and *In re Gallo, supra*, 117 *N.J.* 365, 568 *A.*2d 522. In those cases the attorneys were guilty of flagrant record-keeping violations but not of intentional misappropriation. Although we find that respondent did not knowingly misappropriate funds, his conduct was extremely careless. His record-keeping was totally inadequate. As the concurring

| Year | Number of Attorneys |
|------|---------------------|
| 1988 | 6 |
| 1989 | 11 |
| 1990 | 12 |

When the attorney has generated multiple claims, sometimes paid by the Fund over several years, he or she is counted only once.

opinion amply demonstrates, respondent has an appalling lack of knowledge of the maintenance of separate trust balances for each client. The record clearly and convincingly establishes a violation of *Rule of Professional Conduct* 1.15, requiring the safekeeping of clients' property and compliance with the record-keeping requirements of *Rule* 1:21–6.

Nevertheless, discipline is not imposed in order to punish the attorney but to protect the public against members of the bar who are unworthy of their trust.

The Edones (recall that respondent had hired John Edone, an accountant, to reconcile his books of account) wrote:

After we completed the audit, we discussed the shortcomings with Michael and instructed him with regard to the proper procedures to be followed in the maintenance of his trust account in light of our experience as accountants. Michael immediately implemented these instructions. If Michael's account was out-of-trust, it was so as a result of mistake and/or negligence, but not intent.

The Wiegands wrote:

If Michael's trust account was in an out-of-trust situation at any time, we can only say that it had to have occurred as a result of mistake and/or negligence. We are deeply aware of Michael's commitment to the law.

One of the Armagosts, who had been a secretary of respondent and worked on the family trust, wrote:

The estate matter was not only a part of the office, it was a family matter to me. As a result, had I thought something to be amiss, or remiss, with regard thereto, I would have immediately brought it to Michael's attention. The fact that I never had occasion to note any difficulties with this particular file, or any other matter, is indicative of the fact that any out of trust situation was not discovered or known by myself, [another secretary,] or Michael. The fact that the random audit, some years later, indicates that an out of trust situation existed can only reinforce the fact that it occurred through mistake or negligence. To say that Michael, or any of us, would put a matter out of trust intentionally, is not correct, since we all strove to be as careful as humanly possible to insure that the trust account was correct. I know for a fact that the balancing of bank statements and the checkbook were virtually the exclusive province of myself and [another secretary].

In determining the appropriate discipline, we consider the interests of the public, the bar, and the respondent.

We find that the following mitigating factors exist in favor of respondent: an otherwise unblemished record for almost twenty years of practice; the absence of any financial injury as a

result of his ethical violations; and, on realizing his error, his quick and appropriate corrective measures, including retention of an accountant to handle his trust account. Respondent has assured us that he will have an accountant review his books and that his system of accounting will be in compliance with the rules. We believe that the discipline to be imposed in this case, then, should be closest to that imposed in *In re Librizzi, supra,* 117 *N.J.* 481, 569 *A.*2d 257. We therefore direct that respondent be suspended from the practice of law for a period of six months.

Respondent shall reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

All of the members of the Court join in Parts I and III of this opinion. The Chief Justice and Justices CLIFFORD, HANDLER, and POLLOCK join in Part II of the opinion.

STEIN, J., concurring.

The Court heard argument on this attorney-disciplinary proceeding in October 1989, following the Disciplinary Review Board's (DRB) recommendation that respondent be disbarred for knowingly misappropriating clients' trust funds, as required by this Court's decision in *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). Before us, the Office of Attorney Ethics (OAE) argued that disbarment was the only appropriate discipline in view of respondent's knowing misappropriation of clients' funds.

Based on its own careful and comprehensive review of the proceedings before the District Ethics Committee (DEC) and the DRB, the Court today concludes that this record does not contain clear and convincing evidence of knowing misappropriation and determines that respondent's suspension from practice for six months constitutes adequate discipline for his transgressions. I am in full agreement with the Court's conclusion that a knowing misappropriation has not been established and with the measure of discipline imposed by the Court.

I write separately because in my view this record offers an additional insight. Concededly, it presents a close question on whether respondent knew or should have known that he was using clients' trust funds to make payments on homes owned by his parents and sister. However, I am thoroughly convinced by respondent's forthright testimony acknowledging his ignorance concerning basic principles of trust-account management, confirmed by his counsel's candid account of their discussions, that respondent did not have any understanding that his trust-account practices violated the Rules of Professional Conduct. Apparent from this record is respondent's naivete concerning rudimentary principles of trust-account management. That this lawyer, with an otherwise unblemished record and a compellingly-credible explanation for his admitted mismanagement of his accounts, would find himself on the brink of disbarment can be attributed only to the understanding by the OAE, the DRB, and a majority of this Court that disbarment is the only discipline authorized by our decisions. *See In re Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153. That shared understanding leads me to conclude that although the *Wilson* rule is the right rule for the vast majority of knowing-misappropriation cases, the inflexibility with which it can be applied runs the risk of creating within our attorney-discipline system an almost reflexive approach to such cases, obscuring and ignoring the individual circumstances to an intolerable degree. For me, the answer is not a return to the uneven and unpredictable disposition of misappropriation cases that existed prior to *Wilson* but rather a less rigid and more pragmatic application of the *Wilson* rule to accommodate unique circumstances.

I

Apart from the allegations of knowing misappropriation set forth in the OAE's complaint, the record of proceedings before the DEC contains scarcely a hint that this attorney's license was on the line. The OAE called no witnesses, relying primarily on the affidavit and work sheets of its staff accountant, Robert J. Prihoda, who conducted a random audit of respondent's accounts covering the period November 1983 through

March 1987. The OAE's exhibits were admitted without objection from respondent's counsel. In an opening statement the OAE attorney described the result of the random audit and then rested. Respondent's counsel also made an opening statement, conceding that respondent's trust account had frequently been "out of trust" but denying that respondent had knowingly misappropriated clients' funds. He argued that if a reprimand were to be imposed, it should be a private reprimand because respondent's noncompliance was the result of mere carelessness.

Respondent was the only witness, testifying candidly in his own behalf and expressing no disagreement whatsoever with the findings of the OAE's accountant. He explained the origin and operation of the subsidiary account he maintained within his trust account entitled "Konopka, Paul & Eva, to Spencer Savings and Loan," which was the focus of the OAE's allegations of misappropriation. According to respondent, his sister had been divorced in 1982 but lacked the funds to pay her former husband for his share of a two-family house in Clifton that they had owned. To assist their daughter, respondent's parents, Paul and Eva Konopka, refinanced their Passaic home, borrowing $30,000 from Spencer Savings and Loan Association, and used those funds to purchase the Clifton house from their daughter, who nevertheless retained title. She then used the proceeds to pay her ex-husband, pay off a second mortgage and other indebtedness, and pay for needed renovations. Respondent testified that he had moved into the second-floor apartment and that his wife's sister had resided in the first-floor apartment. Respondent's father had requested that respondent make the payments necessary to amortize both his sister's first mortgage and his parents' second mortgage, using the monthly rent from both apartments and supplementing it with his own funds. He testified that neither his parents nor his sister could carry the mortgages, but that his parents believed in "real estate" and wanted to "save" the house for his sister.

According to the affidavit and work papers of the OAE accountant, respondent deposited rent checks from the Clifton property, legal fees, and his own paychecks for National Guard duty into the trust account, and made payments out of the trust account for the mortgages on both the Clifton property and his parents' home. The accountant recorded twenty-six occasions during a three-year period from August 1982 to September 1985 on which there were negative balances in the so-called "Konopka" account, the largest negative balance amounting to $6,374.37 on September 25, 1984. According to the accountant, the negative balances resulted in invasions of trust funds held for five separate clients. The specific instances on which clients' funds were invaded are set forth in the DRB opinion. The OAE accountant's affidavit concluded with the observation that on the occasion of his second visit to respondent's office, the trust account was balanced and no longer being used to make mortgage payments on the homes owned by respondent's parents and sister.

The DRB relied on two excerpts from the OAE accountant's affidavit and work sheets to sustain its conclusion that there was clear and convincing evidence of knowing misappropriation. The accountant noted that the ledger sheets maintained by respondent to record deposits and disbursements for the "Konopka" account did not contain a third column in which the current balance was recorded. Nevertheless, the first line of several pages of the ledger sheets reflected a carry-over balance from the prior page. One such entry showed a balance of $153.81, and was followed by two disbursements each in the amount of $500. The DRB concluded that respondent's entry in the ledger in his own handwriting of disbursements in excess of recorded available funds constituted clear evidence of knowing invasions. But as the Court observes, "[t]he OAE did not prove exactly how or when Konopka made the notation of a running balance at the top of the ledger sheet." *Ante* at 230, 596 *A.*2d at 735. The only evidence on that issue came from respondent, who surmised that "[t]he checks probably were written, and

then I entered them in the book." No evidence established that respondent knew the amount of the balance in the Konopka account when the checks were written.

The other evidence cited by the DRB concerned a trust-account deposit for clients Donna and John Edone, representing a settlement of a personal injury claim. As the DRB observed:

In the *Edone* matter, respondent deposited $5,000.00 into his trust account on January 24, 1983. This $5,000.00 was subsequently paid over to Ms. Edone on February 15, 1983. However, as of February 13, 1983, the trust account reflected a balance of [$3,867.39], creating a $1,132.61 shortage in the *Edone* funds. On the same day the $5,000.00 was disbursed to Mrs. Edone, respondent deposited $1,500.00 of his personal funds into the trust account, thus bringing the trust account total from $3,867.39 to $5,367.39, an amount sufficient to cover the disbursement.

Based on that sequence of events, the DRB concluded that respondent had made a deposit that corresponded almost exactly to the amount he was "out of trust" in a client's account, generating the inference that he was aware that his client's funds had been used for something other than the client's purposes.

However, the DRB did not note other testimony in the record concerning the Edone funds. Respondent testified that he had charged the Edones no fee for settling their claim, observing that he and the Edones had been friends for over twenty years, that he had attended their wedding, and that John Edone had been his accountant since he had begun to practice law. Respondent testified that the $1,500 deposit he made on February 16, 1983, was unrelated to the Edone check, which he had issued the previous day. He stated that he had made the deposit to cover mortgage payments due for the month of March 1983. He also testified to his belief that the Edones would have loaned him $1,500—less than the fee he could have charged for his legal services—had he known that his trust account was in deficit. A thoroughly supportive letter submitted to the Court by the Edones corroborates respondent's impression.

Thus, respondent's testimony directly contradicted the conclusions reached by the DRB concerning the only evidence in the record purportedly demonstrating that respondent had knowingly invaded clients' funds.

There is, however, another aspect to respondent's testimony, not credited by either the DRB or the Court, relating to the extent of respondent's knowledge about the proper maintenance of a trust account. Respondent's uncontradicted testimony before the District Ethics Committee has an unmistakable ring of truth:

A. With reference to this matter, I would just indicate in the beginning, that Mr.—I don't know his full name, Prihoda, when he came into my office and went through the audit, I'll call it that, made a number of suggestions.

He also indicated as to me that there were problems with the Konopka account, my mother and father's account. He indicated to me that such a long running thing should not be kept in the manner that I had kept it.

As a matter of fact, he was not pleased at all with my bookkeeping, which I understood. So from the beginning, that's why there's no necessity for Mr. Prihoda's testimony here. What he says in his affidavit is what he saw. And I have no objection to what he saw.

He was very helpful. As a matter of fact, after he left—and one of the biggest problems I had was I kept a ledger. And from Skills and Methods days, I was under the impression—it's my fault—that the ledger had to be bound and numbered. Mr. Prihoda indicated to me that that is not a necessary thing.

But what he did indicate to me was the problem with the ledger, was that all I was keeping was an in and out column. I was not keeping the third column.

Since then, I've done it where I have in, out, and a running balance on each file.

\* \* \* \* \* \* \* \*

My father said, you collect the rent, and you pay the two mortgages. He said, whatever the difference is, you pay the mortgage on 325 Boulevard, you pay the mortgage on Spencer Savings, and you live there. Which is what I did.

Anything like National Guard checks—I put fees into this account, in my mind were rent. I never had a set monthly rental.

My father didn't say pay four hundred dollars a month. My father said, whatever it is, Michael, because I can't pay this mortgage that I'm taking out for your sister and putting on my house at 325. And I can't pay Spencer's. We're going to save the two family, and this is how we are going to do it.

And this is what I did. I paid that mortgage on 325. And I paid that mortgage on 26 Viola. Any monies that I put into this account, I did not consider my monies.

As a matter of fact, even when Mr. Prihoda asked me about this, I said this is not my money. Where am I supposed to put money that is not mine? And that's when he indicated to me that this is a problem. This type of situation causes a problem. That I could put—I should have managed this out of a separate checking account, rather than in the—like the second trust account type thing.

That's what I should have done, which I didn't do. I thought that the only accounts an attorney could have was [sic] a trust account, a business account, and on occasion, with a closing where they wanted a savings account to get interest on a large deposit or a money market fund.

\*     \*     \*     \*     \*     \*     \*     \*

I also did things that Mr. Prihoda pointed out—he said to me, how come you have this notation, *i.e.*, transfer fee from page such and such. And I said, well, what I would do if I was owed a fee in a matter, rather than take the check out, put it in my regular account, take the check out of my regular account, put it back into my trust account, I just made the notation transfer fee to [sic].

And he drew my attention to the fact that this is not permitted.

As far as I understood, and speaking with my accountant, as long as I reported my income, there was no problem. I understand now, that that's a problem. I don't do that.

But I would do it. I would borrow—For instance, there's a Mr. Morrel, whom I've known for fifteen years, where monies were needed for the house, and I would, on behalf—actually on behalf of my mother and father who know him, I would say Charley, can I borrow a couple of thousand dollars. And he would say yeah. I have money in a trust account for a transaction, or what have you. He would say take the money from there, or he would give me the money and I would put it in, and then I would write a check out of here to show that I paid him back, because this wasn't money that I was using for myself. And that's how this account ran.

Now, I admit that it's not the best way to do it. If I were ever to be—to have—and I will, because I have a client that goes to Greece—if I ever have a situation where I have to run something like a building or anything like that again, it's run out of a separate account.

But I didn't—I thought this is the way you are supposed to do it. I'm wrong. I did take certain monies out of here, which I considered to be like my money back. If I overpaid, or put too much money in.

I didn't realize, though, at the time, what was happening with the out of trust situation. I didn't realize that.

The bank statements would come in, and Renee, who is now my paralegal, who was my secretary then, she would do the bank statement. And the bank statement and the checkbook balanced, and that was the end of it.

Now I know that you do the bank statement, you check it with the checkbook, and you check it with the clients' ledger.

I now have, in the ledger, not only client by client, but I have a control sheet in the front, where I can add up what is supposed to be there for all of my clients, get a balance. I can verify that by going page by page.

And when the statements come in, and they are done, all three have to match. I know that now.

Also, I didn't know something that this gentlemen was kind enough and nice enough to point out to me, which is the quarterlies.

And he showed me, in his calculations, where the troubles were, i.e. on such and such a day Michael—this statement says—and it's in the middle of the statement, there's a place where he circled it. He said you're supposed to have "X" amount of dollars in your trust account and you didn't. And that's where the quarterlies come in.

The immediate thing in the—He and another gentlemen showed myself, and I believe Renee, I believe she was there for that. I didn't know how to do this, and now we do it.

It never entered my mind, and I never realized that I was out of trust, to use those words.

I never knew the methods. It's my fault. I'm supposed to read the rules.

    \*      \*      \*      \*      \*      \*      \*      \*

The biggest problem with this account was the fact that I did not have that third column. I just had the in and out column. And at the end I would, on not all of them, because that was foolish of me too, I would like total and see what had been spent and what went in and what went out, but not on all of them. That is my fault.

I tried, in doing this, to be as meticulous as I could, in saying what things were for, where they went.

    \*      \*      \*      \*      \*      \*      \*      \*

I can't say that my record keeping was the best in the world, I dare say no. And Mr. Prihoda taught me a lot about record keeping.

    \*      \*      \*      \*      \*      \*      \*      \*

Another thing that Mr. Prihoda brought to my attention was something I didn't know. That on occasion, like at the closing or what have you, I would get a check for a fee out of the trust account. I would go to the bank, and I didn't know that this is wrong, but he brought it to my attention.

I would go to the bank and I would sign the check and cash it for my fee. He said you can't do that. You're not supposed to do that.

He said the trust check, put it in your regular account, write a check out of your regular account and go to the bank and cash it.

That's what I do. There are a lot of changes he suggested, all for the better. I cannot deny that this man did not help me and did not do a good job for me personally. Because to tell you the truth, probably I would have had a bigger problem, if I would have been using this archaic system I had been using over

the years, in the future by not watching things the way I'm supposed to watch them.

He was very helpful. He sat and talked to me. He gave me documents, forms on how to do it. He actually sat down and showed me how to do these things. He took the time. And I appreciate that.

So, I can't say anything more than I've said. But that's the account, insofar as being out of trust.

He showed me in my office. And he made the suggestion, because he said look, I can't sit here all day and figure out this thing for you. He said, why don't you take this all to your accountant.

And I did. And that happened to be Johnny Edone, whom I've known for twenty years, better than twenty years. And Mr. Edone put everything on a computer, figured everything out, and told me that there was a shortage in the account. He said it's somewhere in that—your mother and father's ledger sheet somewhere.

He said, but close that down like the guy told you, balance it out, and start with, you know, get that account out of that. So I got it out.

I funded the money. I think it was, I forget, a thousand dollars, something like that. Put it into the trust account. Started doing these sheets. And I haven't had a problem since with it. Took John about a week to figure that out, using his facilities at—in Lodi, his office.

And that's it. That's all I can say. I can't deny that I didn't comply with the way I should have done it. Ignorance, not knowing, not reading is no excuse here.

Q.   Did you ever have a check presented back to you, that did not clear for insufficient funds?

A.   No, sir.

*        *        *        *        *        *        *        *

Q.   [OAE Attorney] Okay. Let's see here. So the allegations of the complaint in the fifth count, namely that for—on six separate dates between April 20, 1983, and June 24, 1983, that the balance was—in the trust account was less than sixty-five hundred dollars, is clearly admitted by you?

A.   If that's what his analysis—I'm not contesting his analysis, sir.

Q.   Okay.

A.   My contest here is not that I did not—that I did keep accurate books, that I wasn't careless, that I didn't realize the method by which this is supposed to be done.

My contention here is that I didn't do this personally. For personal benefit I never took a nickel.

Before the DRB, respondent's counsel related that during his first interview with respondent, he had found it necessary to explain to respondent what it meant to be out of trust:

MR. FERRANTE: With regard to the—that issue, and I think that's the only issue, it was obvious, and I think one of your members here just made the

comments with regard to his ledgers. The ledgers evidence a very sloppy, very improper way of keeping an account of your trust account.

It is obvious that Mr. Konopka did not try to cover up any transaction. All the transactions are contained on that ledger card.

What struck me as the most important comment that I could make to this Board which is outside of all the evidence that you have before you, is when Mr. Konopka came to my office originally with regard to this matter, I spent approximately fifteen minutes trying to explain to him what out of trust meant. He didn't understand that when you run a trust account an out of trust situation is a—is a very critical situation. He seemed to look at his trust account as if, as long as a check didn't bounce, as long as there were sufficient funds in the account that there were no problems.

When I tried to explain to Mike, that what you have to do is have a record where you can separate the various deposits in your account so that you knew that you had enough in your trust account to cover that one deposit. You couldn't—you couldn't look at your trust account as one sum. You had to look at it as various deposits and never allow the balance to go below that.

Even if this record is read to sustain the OAE's contention that respondent knew that funds of other clients were being used to make mortgage payments for his parents and sister, serious doubt exists about whether respondent understood that his method of operating the trust account was prohibited. The DRB Chairman acknowledged the issue when he engaged in this colloquy with respondent's counsel:

CHAIRMAN TROMBADORE: That is, that his impression was, so long as checks didn't bounce, so long as he could write a check and clear the check he was okay.

That's what he told you?

MR. FERRANTE: Yes, sir.

CHAIRMAN TROMBADORE: Is that a—

\*    \*    \*    \*    \*    \*    \*    \*

CHAIRMAN TROMBADORE: —defense to a *Wilson* charge?

This is not the first time a respondent charged by the OAE with knowing misappropriation has advanced ignorance of trust-account record-keeping requirements as a defense. See, e.g., *In re Gallo*, 117 *N.J.* 365, 373, 568 *A.2d* 522 (1989) (rejecting OAE's contention that attorney engaged in knowing misappropriation and according significance to "respondent's apparent unfamiliarity with the basic principles concerning administration of a lawyer's trust account and his apparent lack

of knowledge concerning the current daily balance in the two accounts he did maintain"); *In re James,* 112 *N.J.* 580, 591, 548 *A.*2d 1125 (1988) (rejecting OAE's contentions that attorney knowingly misappropriated clients' funds and concluding that "respondent in good faith perpetuated an inadequate system that led to negative balances in his trust account. In short, his misuse of trust funds was the product not of a knowing misappropriation, but of gross negligence.").

The OAE's attorney did not address the issue of respondent's apparent unfamiliarity with trust-account procedures and requirements. Rather, he concluded his argument before the DEC by stating:

> And while I remain with the concessions that I began my closing with, namely that I don't believe that he ever permanently intended to deprive anyone of funds, I do think the facts show clearly and convincing[ly] that he had every purpose to make temporary use of these, and then to put the monies back in.

Nor did the DRB respond to Konopka's contention that he never knew that his trust-account practices violated the Rules of Professional Conduct. Obviously, the primary focus of both the OAE and the DRB—consistent with our holding in *Wilson*—was on whether respondent knowingly used clients' funds for his own purposes. In their view, again consistent with *Wilson,* a separate determination of whether respondent deserved to be disbarred was unnecessary.

## II

To argue against the rule of *In re Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153, is indeed difficult. The rule is simple but compelling: a lawyer who steals his or her client's money shall never again be allowed to practice law. Its rationale is virtually unassailable:

> What are the merits in these cases? The attorney has stolen his clients' money. No clearer wrong suffered by a client at the hands of one he had every reason to trust can be imagined. The public is entitled, not as a matter of satisfying unjustifiable expectations, but as a simple matter of maintaining confidence, to know that never again will that person be a lawyer. That the moral quality of other forms of misbehavior by lawyers may be no less reprehensible than misappropriation is beside the point. Those often occur in a

complex factual setting where the applicability or meaning of ethical standards is uncertain to the bench and bar, and especially to the public, which may not even recognize the wrong. There is nothing clearer to the public, however, than stealing a client's money and nothing worse. Nor is there anything that affects public confidence more—much more than the offense itself—than this Court's treatment of such offenses. Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence.

[*Id.* at 456–57, 409 *A.*2d 1153.]

I recognize as well that the Court's opinion in *Wilson* was not insensitive to the mitigating circumstances that often complicate the record in misappropriation cases, circumstances such as illness, drug or alcohol abuse, marital discord, family or financial pressures, or emotional distress. The *Wilson* opinion recognized in advance that disbarment for misappropriation committed in the context of such circumstances would be extremely harsh, justifiable only because public confidence in the bar was a more compelling circumstance:

The considerations that must deeply trouble any court which decrees disbarment are the pressures on the attorney that forced him to steal, and the very real possibility of reformation, which would result in the creation of a new person of true integrity, an outstanding member of the bar. *See, e.g., In re Harris* [, 88 *N.J.L.* 18, 24–26 [95 *A.* 761] (Sup.Ct.1915) ]. There can be no satisfactory answer to this problem. An attorney, beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact, he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary.

[*Id.* at 460, 409 *A.*2d 1153 (footnotes omitted).]

Adoption of the *Wilson* rule was significant for another reason. Prior to *Wilson*, this Court did not invariably disbar lawyers who engaged in misappropriation or related improprieties. A 1984 survey revealed that from 1948 to 1957, during the tenure of Chief Justice Vanderbilt, 77% of attorneys guilty of financial improprieties were disbarred; from 1957 to 1973, during Chief Justice Weintraub's tenure, 61% of such attorneys either were disbarred or resigned with prejudice; and from

1973 to 1979, during Chief Justice Hughes's tenure, 49% of such attorneys were disbarred or resigned with prejudice, the balance having been suspended. David Johnson, *Lawyer, Thou Shalt Not Steal*, 36 *Rutgers L.Rev.* 454, 460–74 (1984). The pre-*Wilson* period was characterized by somewhat uneven results in misappropriation cases. See, *e.g.*, *In re Beckmann*, 79 *N.J.* 402, 400 *A.2d* 792 (1979) (respondent pleaded guilty to embezzlement of client funds for which he was imprisoned and acknowledged knowing misappropriation of clients' funds in two other matters, resulting in substantial payment to claimants by Clients' Security Fund; respondent suspended indefinitely with reinstatement conditioned on restitution to Clients' Security Fund); *In re Stout*, 75 *N.J.* 321, 382 *A.2d* 630 (1978) (respondent who knowingly misappropriated over $40,000 of clients' funds suspended for one year); *In re Fruchter*, 64 *N.J.* 435, 316 *A.2d* 693 (1974) (respondent who did not dispute charges of converting trust funds for his own use, issuing overdrafts, and failing to maintain proper records suspended for three years).

Since 1979 the bright-line *Wilson* rule has superseded the prior practice of *ad hoc* dispositions in misappropriation cases. The *Wilson* rule appears to have been well received by the bar, there having been no perceptible opposition to either its announcement or its consistent application.

Although the Court in *Wilson* anticipated that disbarment for knowing misappropriation of clients' funds would be "almost invariable," with "no significant exceptions," *Wilson, supra,* 81 *N.J.* at 453, 409 *A.2d* 1153, in its application the rule has been *absolutely* invariable and has tolerated *no* exceptions. Every lawyer found by this Court knowingly to have misappropriated clients' funds after the date of *Wilson* has been disbarred. I have reached the conclusion that our application of the *Wilson* rule has become too rigid.

Any hard-and-fast rule obscures the need for judgment. If knowing misappropriation equates with disbarment, then there

is no need for the OAE, the DECs, the DRB, or this Court to look beyond bookkeeping entries in the trust ledger to decide misappropriation cases. Never mind that we are extinguishing a lawyer's professional life permanently and irrevocably. Under *Wilson* we have left no room to consider specific circumstances, no matter how compelling.

The Court has expressed deep concern at the harshness of imposing permanent disbarment under the circumstances of some misappropriation cases. In *In re Hein*, 104 *N.J.* 297, 516 *A.*2d 1105 (1986), for example, the respondent candidly admitted that he had collected on behalf of clients almost $1400 due on a second mortgage and converted the funds to his own use. He argued, however, that his misconduct was related to alcoholism, acknowledging before the District Ethics Committee that he had "very serious drinking problems." *Id.* at 300, 516 *A.*2d 1105. We determined that the respondent's misconduct had resulted from "the extensive pressure of coping with his alcohol dependency and its ravaging effects upon his life and practice." *Id.* at 301–02, 516 *A.*2d 1105. We observed that "a similar effect on perception, cognition and character may be caused by financial reverses, especially when that results in extreme hardship to respondent's family." *Id.* at 302, 516 *A.*2d 1105. We concluded that the record did not establish that respondent's alcoholism had prevented him from forming the requisite intent to misappropriate, acknowledging that "[t]hese psychological states are extremely difficult for us to resolve. We do not purport here to determine definitively the effect alcohol dependency can have on the volitional state of a person. We have only the legal standard to guide us. We wish that we knew more." *Id.* at 303, 516 *A.*2d 1105.

Nevertheless, the Court expressed its difficulty in reconciling the sanction of permanent disbarment with the case of the rehabilitated alcoholic. I quote at length from the Court's thoughtful opinion:

The circumstance of the rehabilitated alcoholic or addict is deeply troubling to us. He has presumably recovered from the condition that contributed to cause

his clients harm, and he will probably never again do any harm. But many of the lawyers, nonalcoholic, nonaddicted, disbarred by us for misappropriation would probably never again misappropriate. Indeed the probabilities may be even greater. Yet we disbar. That individual harshness—and so it is in most cases—is justified only if we are right about the devastating effect misappropriation—unless so treated—has on the public's confidence in the Bar and in this Court. Our primary concern must remain protection of the public interest and maintenance of the confidence of the public and integrity of the Bar.

There may come a time when knowledge of the effect of drugs or alcohol, or other dependency upon the ability of individuals to conform their conduct to a norm, may lead us to alter our current view. Programs may be developed in conjunction with the Bar and the involved professionals that will promise the avoidance of public injury with the concurrent rehabilitation of dependent attorneys. We have seen, as they attest, that dependent attorneys become skilled at deception, not only of others, but of themselves. The best help is self-help, but others may be able to detect the need and help attorneys to take the first step to recovery. Under such programs an attorney could demonstrate commitment to a firm plan of recovery from the disease or condition. That in turn could assure the Court, and therefore, the public, of the individual's ability to practice under circumstances or conditions that will assure public confidence until the disease or defect was arrested. For now, we find it difficult to exonerate the conduct influenced by the compulsion of alcohol dependency as contrasted with the compulsion to preserve one's family or assist another in a time of extreme need.

We do not completely close the door. We never will. The Alcoholism Advisory Committee established by interested lawyers and professionals has already aided the Court and the disciplinary process in understanding these issues. New efforts undertaken by the State Bar Association give reason to hope that we may someday better begin to understand and deal with the effect of this disease in the profession.

[*Id.* at 304–05, 516 *A.*2d 1105.]

In reciprocally disbarring respondent Hein from practice in the United States District Court, Judge Sarokin observed that "[ ]if what caused [Hein's] infractions no longer exists, should not compassion and understanding permit a second opportunity?" 120 *N.J.L.J.* 787 (Oct. 29, 1987). See also *In re Canfield*, 104 *N.J.* 314, 516 *A.*2d 1114 (1986) (alcoholism not sufficient mitigating factor to overcome presumption of disbarment in misappropriation case); *In re Monaghan*, 104 *N.J.* 312, 516 *A.*2d 1113 (1986) (same).

In *In re Warhaftig*, 106 *N.J.* 529, 524 *A.*2d 398 (1987), the respondent had simultaneously suffered "a precipitous decline in his real-estate practice" and incurred large medical expenses for his wife's cancer treatments and for his son's psychiatric

counseling. *Id.* at 531, 524 *A.*2d 398. He had begun prematurely to withdraw predicted fees from funds received for pending real-estate matters, all the while keeping lists of client names, withdrawals, fees eventually earned, and redeposits. *Id.* at 530–31, 524 *A.*2d 398. All withdrawn funds had been replaced prior to discovery, and thus "no client was injured." *Id.* at 534, 524 *A.*2d 398. Warhaftig fully cooperated with the investigation. *Id.* at 535, 524 *A.*2d 398. The Court noted "the very real hardship that beset respondent's family and apparently led to his wrongful conduct" and found "especially tragic" that such hardship had contributed to "the disbarment of an attorney who, for the better part of his career, has conducted himself in an exemplary fashion." *Ibid.* The Court was nonetheless compelled by *Wilson* to order disbarment.

Based on my experience in applying the *Wilson* rule, I no longer find its mandate to be invariably acceptable. If all the cases involved evidence of knowing misappropriation as strong as that in *Wilson,* then I could tolerate an unbending application of *Wilson.* The misappropriation cases before this Court, however, reflect many shadings of proof. Although the Court has usually been unanimous even in close misappropriation cases, the burden of uniformly applying *Wilson* is readily discernible from a close scrutiny of the opinions in several difficult cases. See *In re Gallo, supra,* 117 *N.J.* 365, 568 *A.*2d 522 (respondent who invaded client trust funds suspended for three months; proofs did not establish knowing misappropriation but rather that respondent was unfamiliar with principles of trust-account administration and followed practice of prior employer); *In re Gold,* 115 *N.J.* 239, 557 *A.*2d 1378 (1989) (respondent suspended five years for combining business and trust accounts into single all-purpose account; DRB divided five to four on whether record demonstrated knowing misappropriation, and Court found evidence insufficient to establish post-*Wilson* knowing misappropriation); *In re Sommers,* 114 *N.J.* 209, 553 *A.*2d 789 (1989) (respondent disbarred for knowing misappropriation; Court divided four-to-three on whether

record established knowing misappropriation by clear and convincing evidence); *In re James, supra,* 112 *N.J.* 580, 548 *A.*2d 1125 (respondent suspended three months for ethical violations; although respondent had misused trust account for twenty-four years as "second business account" to pay litigation costs, payroll taxes, and other expenses, no evidence in record demonstrated knowing misappropriation of client funds); *In re Simeone,* 108 *N.J.* 515, 531 *A.*2d 729 (1987) (respondent suspended six years for ethical violations; although respondent had withheld closing proceeds from seller for four months and had used $10,000 of personal funds to pay amount due, record lacked clear and convincing evidence of knowing misappropriation); *In re Johnson,* 105 *N.J.* 249, 520 *A.*2d 3 (1987) (respondent suspended indefinitely for having misappropriated clients' funds; although respondent had misused, commingled, and failed to account for clients' funds, and had been out of trust in respect of three litigated matters—resulting in payments by Clients' Security Fund of $29,501.68 to eleven claimants—record did not establish clear and convincing evidence of knowing misappropriation of clients' trust funds); *In re Orlando,* 104 *N.J.* 344, 517 *A.*2d 139 (1986) (respondent suspended four-and-one-half years for failure to have maintained adequate trust-account records, and suspended indefinitely for use of illegal drugs; evidence of inadequate and negative trust-account balances over five-month period held insufficient to establish clear and convincing evidence of knowing misappropriation); *In re Perez,* 104 *N.J.* 316, 517 *A.*2d 123 (1986) (respondent suspended two years for ethical violations, including failure to preserve identification of clients' funds, failure to maintain records of receipt of funds and render proper accountings to clients, and failure to maintain adequate trust-account records; in view of client's testimony on remand that client consented in advance to invasion of trust funds, contradicting respondent's prior admission, Court divided five-to-two on whether record demonstrated clear and convincing evidence of knowing misappropriation); *In re Fleischer,* 102 *N.J.* 440, 508 *A.*2d 1115 (1986) (respondent disbarred for know-

ing misappropriation; Court divided six-to-one on whether record established knowing misappropriation by clear and convincing evidence).

To discern whether and to what extent the Court's determinations in some cases that the proofs fell short of establishing a knowing misappropriation also reflected the sense that disbarment was a disproportionate punishment for that respondent would be difficult. Nevertheless, inflexible application of the *Wilson* rule forces the DRB and the Court to choose, on a close record, between a finding that knowing misappropriation has not been proved, on the one hand, and disbarment on the other. We need not so narrowly limit our options in imposing discipline on lawyers. Other disciplinary options include suspensions for a term of years, or indefinite suspensions with reinstatement subject to conditions imposed by the Court.

Some may argue that public confidence in the bar and in the judiciary would be threatened by even the slightest relaxation of the *Wilson* rule. My perception is that if there is a problem with public confidence in the bar, it does not exist primarily because a handful of lawyers misappropriate clients' funds. Rather, I suspect that any such lack of confidence is attributable primarily to other conduct and practices by a small group of lawyers that continue to generate public mistrust. I assume that the *Wilson* rule is not widely known outside the bar, and to the extent that it is understood, the public would also understand sensible and limited exceptions to its application. I would favor the continued application of *Wilson* in the vast majority of knowing-misappropriation cases. I am no longer willing, however, to apply it indiscriminately because its indiscriminate application occasionally results in the disbarment of lawyers who would not be disbarred if the Court were to be guided instead by its sound discretion.

### III

I concur with the Court's conclusion that on this record there is insufficient evidence that respondent knowingly misappropri-

ated clients' funds for his own use. The evidence that on one occasion the ledger showed disbursements in excess of the stated balance proves nothing in the absence of evidence that the balance was recorded before the disbursements were made and that respondent was aware of the ledger balance when he wrote the checks. Neither fact is established by the evidence. Furthermore, this record does not establish that respondent knowingly misappropriated approximately $1,300 from his old friend and accountant, John Edone, the alleged misappropriation consisting of an invasion of a $5,000 negligence settlement for which respondent charged no fee.

Nevertheless, on twenty-six instances over three years, trust funds were invaded because the account for respondent's parents had insufficient funds. That circumstance, combined with respondent's concededly inadequate trust ledger, might fairly suggest that respondent must have known that clients' funds occasionally had been used to pay his parents' and sister's mortgages. Respondent's candid, unrebutted, and thoroughly credible testimony was that he never knew that to be wrong, never understood that a balanced trust account was not the limit of his professional responsibility.

Had the Court read this record to sustain a finding of knowing misappropriation, however, respondent's avowed and credible explanation for his misconduct would have been irrelevant. Applying the *Wilson* rule, the Court would have been required to disbar respondent, in accordance with the DRB's recommendation. The majority observes that "[n]o more radical exception to *Wilson* could be designed," *ante* at 232, 596 A.2d at 736, than to permit consideration of an attorney's inexperience in the management of a trust account in fashioning appropriate discipline. Their position is that a lawyer's state of mind is decisive on the issue of disbarment, and that mitigating evidence, such as a lawyer's unfamiliarity with basic principles of trust-account management, cannot be considered in imposing discipline for a knowing misappropriation. The majority overlooks *In re Gallo, supra,* 117 *N.J.* at 373, 568

*A*.2d 522, and *In re James, supra,* 112 *N.J.* at 591, 548 *A*.2d 1125, in which we attached significance to the respondents' unfamiliarity with basic principles of trust-account management. Moreover, the majority's application of *Wilson* precludes consideration of *any* mitigating evidence if a knowing misappropriation is proved. My view is that so rigid an application of *Wilson* unnecessarily restricts both the DRB and this Court in the administration of attorney discipline. Thus, if this record presented clear and convincing evidence of knowing misappropriation, the Court should have been free to consider not whether respondent would be excused for his naivete, but whether he must be disbarred in spite of it.

To the extent *Wilson* precludes us from considering the entire record in misappropriation cases, I am no longer satisfied that it is necessary for the Court to follow its mandate unreservedly. I believe the *Wilson* rule should continue to guide the Court in determining the discipline to be imposed in the vast majority of misappropriation cases. Those determinations, however, would in my view better reflect the collective wisdom of the Court and better serve the interests of the bar and the public if they were tempered by a recognition that under special circumstances discipline short of disbarment may occasionally be appropriate in knowing misappropriation cases. All of this Court's resources—its experience, discretion, compassion, insight, and judgment—are brought to bear in deciding the wide variety of cases on its docket. We need not limit our available resources when we decide attorney-discipline cases involving the alleged misappropriation of clients' funds.

Justices O'HERN and GARIBALDI join in this opinion.

260

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that MICHAEL A. KONOPKA of PASSAIC, who was admitted to the bar of this State in 1971, is hereby suspended for six months, effective October 28, 1991, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by MICHAEL A. KONOPKA, pursuant to *Rule* 1:21–6, shall be restrained from disbursement except upon application to this Court, for good cause shown, pending the further Order of this Court, and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.